Lisa DRIGGERS, Plaintiff–Appellant,

v.

CITY OF OWENSBORO, KENTUCKY; John Kazlauskas; Glenn Skeens; and Mark Lee, Defendants–Appellees.

No. 02–6527.

United States Court of Appeals, Sixth Circuit.

Aug. 24, 2004.

Before KEITH, CLAY, and GIBBONS, Circuit Judges.

CLAY, Circuit Judge.

Plaintiff Lisa Driggers, a former Patrol Officer for the City of Owensboro Police Department, appeals the November 15, 2002 order of the district court denying her motion to reconsider the court's grant of summary judgment to Defendants City of Owensboro, Allen Dixon, John Kazlauskas, Glenn Skeens and Mark Lee on her claim under 42 U.S.C. § 1983 for violation of her First Amendment right of intimate association and her claims for sex discrimination and retaliation under the Kentucky Civil Rights Act, KY.REV.STAT. ANN. §§ 344.040, 344.280. For the reasons that follow, we **AFFIRM** the order of the district court.

## I.

### A. Substantive Facts

Plaintiff Lisa Driggers was a member of the City of Owensboro Police Department from October 14, 1996 through June 25, 2000. During most of that time, Driggers was assigned to the same shift as Officer Jeff Palmer, with whom she had a very close, personal relationship both on and off duty. Defendant Mark Lee, then Sergeant Lee, was Driggers' commanding officer. Sergeant Lee also was a friend of Driggers, and he socialized with her while off duty.

On November 24, 1999, Sergeant Lee wrote a memorandum to his superior, Lieutenant Glenn Skeens, setting forth his concerns about the working relationship between Driggers and Officer Palmer. The information in the memo was compiled mostly from conversations Lee had with Driggers. In the memo, Lee characterized Palmer as being "obsessed" with Driggers, constantly demanding to know with whom she had been talking and associating. On one occasion, Palmer demanded to see Driggers' pager, and when she refused, Palmer snatched it off of her uniform, causing Driggers to break two fingernails in the ensuing struggle. The memo also related that Palmer had called Driggers late that night when she returned home and had been verbally abusive to her. According to the memo, Driggers told Palmer to stop calling her, paging her, following her around, and asking with whom she had been associating.

Last, the memo related a disturbing instance in which Palmer told Driggers that he could kill her, change the barrels on their pistols, and it would look like suicide.

In response to Sergeant Lee's memo, Lieutenant Skeens called Driggers in for a meeting on November 29, 1999. Sergeant Lee attended the meeting as well. Both Skeens and Lee asked Driggers about whether Palmer had been following her, stalking her, and harassing her. Driggers answered in the negative. She acknowledged that Palmer had taken her pager on one occasion, but that this was "just a cat and mouse game." Driggers became upset and asked to leave the meeting. Skeens refused her request, accused Driggers of protecting Palmer, and said that he would talk to Palmer about the situation.

The next day, Driggers met with Captain John Kazlauskas and told him that there was no problem between her and Palmer. She admitted that many of the issues raised in Sergeant Lee's memo were "basically true," but claimed they were exaggerated. According to Driggers, Captain Kazlauskas became upset and told Driggers that she "was playing a very dangerous game," that he would "dig and dig and dig until he got the answers he wanted," and that he would go to the Chief to initiate a full investigation. Kazlauskas told Driggers that this was a serious matter, but reassured her that her job performance was not under investigation. Driggers complained that she was being singled out, telling Kazlauskas that male "officers can have disagreements and scream at each other on station all the time and nobody ever says anything; but when I have a disagreement with my best friend, I wind up in their office with a memo and an interview."

Captain Kazlauskas then met with Officer Palmer. According to Driggers, Kazlauskas pressured Palmer into admitting that he had a problem and that he was obsessed with Driggers. Palmer agreed to leave his shift with Driggers, go to counseling, and have no further contact with Driggers on or off duty.

On December 15, 1999, Driggers filed the first of five employment discrimination complaints with the City of Owensboro's EEO Officer, Alma Randolph. The complaint alleged gender discrimination as of November 30, 1999 against Captain Kazlauskas, Lieutenant Skeens, and Sergeant Lee. She complained about being singled out and alienated from her friends at work and that she was interrogated on two separate occasions about a harassment complaint she never filed. She asked not to serve under Lee's supervision. During Randolph's investigation of the complaint, Driggers said that Lee had sexually harassed her by ripping her jeans, putting his hand on her knee, and kissing her.

While Randolph was investigating Driggers' December 15, 1999 complaint, Driggers filed three additional complaints on February 4, 2000. One complaint alleged gender discrimination and retaliation by Lieutenant Skeens. Driggers complained about a "performance notice" Skeens had issued to her for letting her hair hang loosely past the nape of her neck while wearing an official uniform inside the police station. According to Driggers, she had let her hair loose in the past without comment, and male officers had taken items off of their uniforms before leaving the station but were not singled out. Driggers also complained about a conversation Skeens had with a fellow officer in which Skeens asked this officer whether he or Palmer were having sexual relations with Driggers.

A second complaint filed on February 4, 2000 alleged gender discrimination and retaliation against Police Chief Allen Dixon regarding a reference he made in front of

the officers about the EEO complaint Driggers had lodged. Driggers also challenged Chief Dixon's order keeping Officer Palmer from having contact with Driggers while on duty as a violation of Driggers' First Amendment right to association.

A third complaint alleged gender discrimination against Captain Kazlauskas. That complaint reiterated the allegations in her December 15, 1999 complaint and also challenged the Captain's "tyrannical conduct."

EEO Officer Randolph interviewed Driggers on February 4, 2000 about her three additional complaints as well as a follow-up to the initial December 15, 1999 complaint. On March 10, 2000, Randolph completed her investigation of Driggers' four EEO complaints and sent a copy of her findings, conclusions, and recommendations to Driggers. Randolph found that there was no evidence of an attempt to alienate Driggers from members of her shift and that Palmer's transfer to another shift was a reasonable response to the supervisors' belief that Palmer had been harassing her. Moreover, Captain Kazlauskas told Randolph that Palmer had requested to be transferred to a different shift. Randolph also concluded that Driggers was not credible in claiming that Palmer had not treated her in a threatening manner, citing to statements from "several officers and a citizen ... that Officers Driggers told them that Officer Palmer harassed and threatened her." Randolph concluded, "this appears to substantiate the information contained in Sgt. Mark Lee's memo."

As to the harassment allegations against Lee, Randolph noted that Lee had told her that he and Driggers had engaged in consensual sexual acts at the home of a mutual friend, Robby Haynes. Although Driggers denied the relationship, she admitted to sleeping on the same sofa with Lee two to three times at Haynes' house. Several other officers also stated that they had had sexual relations with Driggers, and Officer Lohrn Frazier stated that Driggers had asked him to lie for her about the relationship.

Randolph further noted that Lee admitted to ripping Driggers' jeans, but Haynes, who was dating Driggers at the time, confirmed that Driggers already had a hole in her jeans large enough to show her panties and that he and Lee ripped the jeans together at Haynes' home while she laughed about it. Randolph found that she was unable to substantiate Driggers' assertion that Lee's memo to Lieutenant Skeen was motivated by Driggers' rejection of Lee's sexual advances or Lee's intent to harass or discriminate against Driggers. Randolph concluded that, although Lee's harassment of Driggers was not substantiated, the Police Department acted properly in transferring Lee to another shift where he did not supervise Driggers.

Randolph found no credible evidence of retaliation by Lieutenant Skeens in issuing Driggers a performance notice. She did, however, voice "some concerns regarding the clarity of department policy (i.e., when male and female officers may remove equipment and/or portions of their uniform, let their hair down, etc.)." Randolph reached no conclusion as to whether male officers had committed more serious violations of policies, yet were not disciplined, indicating that such allegations may need to be investigated further. Randolph found no retaliation with regard to Skeens' conversation with another officer about whether he had had sex with Driggers. Assuming the conversation took place, there was no evidence that Skeens took any action or caused any action to be taken against Driggers.

Randolph was not able to substantiate Driggers' allegation that Captain Kazlauskas had engaged in "tyrranical" behavior because no other witnesses were present. And because Driggers had made the same allegation about Kazlauskas' meeting with Palmer, Randolph concluded that gender was not an issue.

On March 14, 2000, Driggers supplemented her retaliation complaint against Chief Dixon. Driggers alleged that, during a roll call of the officers on January 24, 2000, Chief Dixon said, "There's a train barreling through and if you don't want to get hit by it you'd better jump off the tracks now." Driggers indicated she had three witnesses to this statement: Officers Smith, Cosgrove, and Palmer. Randolph interviewed Smith and Cosgrove. Palmer initially had agreed to be interviewed, but then called it off because he had not yet consulted with his attorney; he never consented. In total, Randolph interviewed 14 officers, including Driggers and Chief Dixon. Randolph found that no one confirmed Chief Dixon's comments as being directed at Driggers. Based on these interviews, Randolph concluded that there was no evidence to substantiate Driggers' claim that Dixon had attempted to harass or intimidate her.

On March 15, 2000, Chief Dixon brought formal charges against Sergeant Lee, alleging that Lee had violated the Policy and Procedures and Code of Conduct for members of the Owensboro Police Department by engaging in conduct unbecoming an officer; driving under the influence of alcohol on two occasions; engaging in consensual sexual acts with Driggers while off duty; ripping Driggers' jeans; and failing to report for his scheduled roll call due to being under the influence of alcohol. On June 12, 2000, Lee acknowledged his guilt and agreed to a suspension without pay for 60 days and a demotion from Sergeant to Patrol Officer with a commensurate reduction in pay.

Formal charges also were lodged against Officer Palmer for engaging in a pattern of conduct that had impaired his efficiency as an officer and brought discredit upon the Police Department by taking unreported or unauthorized breaks at Driggers' home; repeatedly violating the order to have no contact with Driggers; acting inappropriately with Driggers in public (including displays of affection); sending sexually oriented e-mails to Driggers; spending inordinate amounts of time with her while on duty and while he was supposed to be working his beat; harassing and stalking Driggers; and engaging in deceptive measures to conceal his meetings with her (lying about responding to calls when he was at Driggers' residence and lying to investigators about spending time with Driggers). An administrative hearing was commenced on the charges against Palmer on April 17, 2000. After one day's testimony, Palmer resigned.

Another officer's employment ended as a result of the investigations surrounding Driggers' complaints. Lieutenant Jeff Smith had been an officer with the Police Department for almost fifteen years and was Driggers' shift supervisor until 1998. He was interviewed by EEO Officer Randolph and by Captain Steve Kimble, both of whom asked whether he ever had a sexual relationship with Driggers. He denied any such relationship. On April 28, 2000, Chief Dixon told Smith that the City of Owensboro intended to press charges against him. All of the charges involved Smith's interaction with Driggers, such as giving her a ride home from work, meeting with Driggers in his office with the door closed, inappropriate e-mail communication with Driggers, and failing to supervise Driggers. Smith denied any wrongdoing,

but he chose to resign effective May 1, 2000 rather than face charges.

After the Police Department had dealt with Lee, Palmer, and Smith, Driggers and her attorney met with Pat Pace, an attorney for the City of Owensboro. There was a discussion at the meeting of the evidence developed by the Department's investigation and various charges that could be brought against Driggers based on the sworn testimony of witnesses at Palmer's hearing and information discovered during the EEO investigation. According to Driggers, the following potential charges were communicated to her: failure to respond to several calls (she claims her actions were justified or denied that the incidents occurred); sending inappropriate e-mails (she admitted); failure to stay away from Palmer, even though she knew Palmer was under order to stay away from her (she claims the order applied only to Palmer); painting her toenails at the front desk area (she admitted); riding in the same vehicle as Palmer (she claims she had permission or she acted consistent with Departmental policy); admitting to dishonesty when she spoke with Captain Kazlauskas about the harassment allegations against Palmer; asking Officer Frazier to lie to Randolph about the nature of their relationship (she denied); being asleep while on duty (she denied); having too much to drink while off duty (she admitted); inappropriate touching of Sergeant Mike Postlewaite's buttocks (she denied); sitting in the parking lot of the Police Department with Palmer and kissing him (she denied); and sitting on the tailgate of a pickup truck straddled over her boyfriend (she denied).

Driggers claims that during the meeting, Pace told her that there were 15 witnesses that would be called against her. He allegedly said that even if she had not committed any of the offenses, there were still 15 officers willing to state that she had. Driggers alleges that she had no choice but to resign. On June 1, 2000, Driggers resigned effective June 25, 2000 so that she would have sufficient time to find other employment.

## B. Procedural History

On October 25, 2000, Driggers filed a complaint in the Daviess Circuit Court for the Commonwealth of Kentucky against the City of Owensboro, Chief Dixon, Captain Kazlauskas, Lieutenant Skeens, and Sergeant (now Officer) Lee. The complaint alleged violations of her First Amendment right of free association, alleging a claim pursuant to 42 U.S.C. § 1983, and further alleged illegal sex discrimination and retaliation in violation of the Kentucky Civil Rights Act, KY.REV.STAT. ANN. § 344.040 *et seq.* Defendants removed the case to the United States District Court for the Western District of Kentucky on November 27, 2000. After discovery, Defendants moved for summary judgment, which the district court granted. Driggers then moved to alter or amend the court's summary judgment order, which the court denied on November 15, 2002. Driggers timely appealed.

## II.

### A. Standard of Review

This Court reviews *de novo* a district court's decision to grant summary judgment. *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1048 (6th Cir.2001). Summary judgment must be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute over a material fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel,* 270 F.3d at 1048 (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Generally, the denial of a motion to reconsider is reviewed for an abuse of discretion. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir.2003) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir.1999)). However, when a Rule 59(e) motion seeks reconsideration of a grant of summary judgment, this Court conducts a *de novo* review using the same legal standard employed by the district court. *Id.* at 454–55 (citing *Smith v. Wal–Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir.1999); *Columbia Gas Transmission, Corp. v. Limited Corp.*, 951 F.2d 110, 112 (6th Cir.1991)).

## B. Sex Discrimination Claim

### 1. *Prima facie* case

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Driggers bears the initial burden of establishing a *prima facie* case by demonstrating: (1) membership in the protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class. *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 728–29 (6th Cir.1999). As discussed below, Driggers has not created a genuine issue of material fact as to the

second and fourth elements of her *prima facie* case.

### a. Adverse employment action

Driggers argues that she suffered an adverse action in the form of a constructive discharge. To demonstrate a constructive discharge, Driggers must show that "1) 'the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit....'" *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir.2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Moore*, 171 F.3d at 1080 (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982))). "Whether a reasonable person would have fe[lt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id.* at 569 (citations omitted).

■ It must be assumed that City Attorney Pace told Driggers she would be charged with numerous counts of misconduct unless she resigned. He also told her there were 15 witnesses who would testify against her, implying that if she did not resign, it would be difficult for her to avoid some form of discipline that might include

dismissal.[1] It does not follow, however, that Driggers' only alternative at that point was to resign. Although her prospect of avoiding some form of discipline appeared to be nil, it was speculative for her to conclude that the inevitable result of disciplinary charges before the City Commission would be her termination. By state law, Driggers could not be dismissed or disciplined without first, the formal filing of charges against her; and second, a hearing before the City Commission, which would have had to decide whether Driggers was guilty of the charged misconduct and then impose the appropriate penalty. KY.REV.STAT. ANN. § 95.450. The hearing before the City Commission, an administrative body acting in a quasi-judicial capacity, would have carried a presumption of fairness and correctness. *Louisville & Jefferson County Planning & Zoning Comm'n v. Ogden*, 307 Ky. 362, 210 S.W.2d 771, 773 (1948). As evidenced by the following statement made by Driggers in a letter she wrote to her attorney, Driggers knew that she had the option of challenging the charges against her, but instead she voluntarily chose to resign: "I have defenses to all of the 'charges' against me but it all seems to come down to whether or not I want to work there anymore. I do not.... Therefore, ... I am willing to resign." By resigning, Driggers cut-short her right to due process and an objective assessment of the facts.[2] Thus, a reasonable jury could not infer from Driggers' meeting with Pace that she had no alternative but to quit the force and sue. *See Summit v. S-B Power Tool, (Skil Corp.), a Div. of Emerson Elec. Co.*, 121 F.3d 416,

421 (8th Cir.1997)("To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.").

Even assuming that Defendants intended Driggers to resign from the force, Driggers cannot prove the other necessary element of a constructive discharge—that the employer deliberately created intolerable working conditions as perceived by the reasonable employee. We agree with the district court's conclusion that Drigger's harassment-based allegations are insufficient to create a genuine issue of material fact as to whether Defendants inflicted objectively intolerable working conditions on her with the intent to cause her to quit. Driggers admitted at her deposition that the initiation of Defendants' investigation into her conduct was a legitimate attempt to prevent her from being harassed or injured by another policeman (Palmer). Her denial of certain conduct that Palmer had admitted reasonably led Defendants to think she was attempting to cover up the truth. As the investigation of Palmer and Driggers' EEO complaints progressed, Defendants learned of alleged misconduct by Driggers and reasonably threatened to charge her with misconduct, as they had done with three other male officers (Palmer, Lee, and Smith). Under these circumstances, no reasonable employee would have perceived either that she had been singled out for adverse scrutiny based on her sex as part of a deliberate scheme to

1. Contrary to Driggers' assertion, however, a jury could not reasonably interpret Pace's statement as a threat to present perjured testimony.

2. Indeed, Pace's allegedly coercive statements appear to have had nothing to do with Drig-

gers' resignation, as Driggers was represented by an attorney at the meeting and further admits that she offered to resign before there was any indication from the Defendants that they would seek her dismissal from the force.

cause a resignation or that she had no choice but to resign.

■ Without a finding of constructive discharge, none of the other adverse conduct Driggers suffered amounted to an adverse employment action. The fact that she was interviewed pursuant to the Palmer investigation or pursuant to the four EEO complaints she herself filed is not an adverse employment action. Nor are the alleged false accusations Defendants allegedly made about Driggers, or the performance notice Lieutenant Skeens issued to her. None of these actions is tantamount to a "materially adverse change in the terms of her employment." *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir.1996) (citation omitted); *see id.* at 886 (holding that a "mere inconvenience" or a "bruised ego" is not enough to constitute an adverse employment action); *Allen v. Mich. Dep't of Corrs.*, 165 F.3d 405, 409–10 (6th Cir.1999) (holding that alleged disciplinary actions in the form of counseling memoranda, supervisors' alleged references to the plaintiff with racial epithets, and supervisors' alleged action of monitoring him more closely than they monitored non-African American employees did not constitute "adverse employment actions" actionable under Title VII).

## B. Replacement by a man or other comparative or statistical evidence

The fourth element of Driggers' *prima facie* case involves replacement by a man or comparative evidence of discrimination. Replacement is not at issue in this case. Thus, Driggers argues that similarly-situated male officers received more favorable treatment. She primarily relies on the experience of Sergeant Lee, who admitted to his misconduct but was permitted to remain on the force. She argues that Lee's misconduct, involving charges of drunken driving, were more serious than the potential charges she faced.

■ Even accepting the argument that Lee's conduct, for which he was not terminated, was equally or more serious than the potential charges Driggers faced, the entire body of comparative evidence does not point to sex discrimination. First, Lee's experience was distinguishable in one significant respect: Lee acknowledged his guilt and agreed to a punishment less than dismissal from service. Driggers, on the other hand, contested every charge against her, lied to investigators, and offered to resign even before the City of Owensboro raised that prospect. Thus, the posture in which Lee and Driggers faced potential discipline was very different, even though their misconduct arguably was comparable in seriousness.

Second, the more appropriate comparison is between Driggers and Officer Palmer, who faced charges stemming from his inappropriate conduct with Driggers as well as from his lying to investigators. The City of Owensboro brought formal charges against Officer Palmer and, like Driggers, faced potential termination. Palmer resigned before his administrative hearing concluded. It likewise is appropriate to compare Driggers' situation to that of Lieutenant Smith, Driggers' shift supervisor until 1998. He was threatened with disciplinary charges stemming from an alleged improper relationship with Driggers. Like Driggers, Smith denied any wrongdoing, and chose to resign. We conclude that the City's treatment of Palmer and Smith, both males who faced disciplinary charges equally or less serious than Driggers and who, like Driggers, resigned, would preclude a reasonable trier of fact from concluding that Driggers' sex had anything to do with Defendants' threat to bring charges against her and her ultimate resignation.

■ Driggers also cites to purported statistical evidence of discrimination. According to Driggers, females make up only 4% to 4.5% of the City of Owensboro's Police Department, whereas women comprise close to one-half of this country's workforce. *Driggers' Br.* at 40. This statistic is not probative of sex discrimination, however, because it fails to compare the gender composition of the police force to the qualified population in the relevant labor market. *Cf. Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)(holding that a "proper comparison" in a case alleging race discrimination in the hiring of public school teachers "was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market"). Driggers herself acknowledges that "this evidence alone may not create an inference of discrimination." *Driggers' Br.* at 40–41. We agree. Without any other probative evidence of discrimination, the statistical evidence cannot save her claim from summary judgment.

### 2. Pretext analysis

Defendants' articulated reason for threatening Driggers with discipline, and potential discharge, involved the violations of departmental regulations that surfaced during Defendants' investigation of Palmer and of Driggers' EEO complaints. Because this reason is legitimate and non-discriminatory, Driggers bears the burden of persuading the trier of fact that Defendants' reason is a pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at

802–05 (stating that in a Title VII discrimination action, plaintiff bears the initial burden of establishing a *prima face* case, then the defendant has the burden to articulate a non-discriminatory reason for its action, and finally, the plaintiff must prove the pretextual nature of defendant's reason).

■ Driggers cannot satisfy her burden of persuasion on the pretext issue. In her brief, Driggers does nothing more than offer a general denial of the potential charges with which she had been threatened. Like the district court, we see nothing more than a scintilla of evidence that undermines Defendants' good faith belief that Driggers had committed numerous acts of misconduct, some of which Driggers herself has admitted. EEO Officer Randolph conducted an exhaustive investigation into Driggers' charges of discrimination and retaliation and found no basis to these complaints. The issue is not whether Randolph correctly made these credibility assessments, but whether she gathered and reported her conclusions to Defendants in an objective, non-discriminatory manner. At most, Driggers has suggested that Defendants were mistaken in concluding from Randolph's investigation that Driggers had not only lied, but violated numerous departmental protocols. There is no factual basis to Driggers' assertion that she was the victim of a vast conspiracy to discredit her and drum her off the force. In any event, with the absence of an adverse employment action and any statistical or comparative evidence of discrimination, a reasonable jury could not find that Driggers was a victim of sex discrimination.[3]

3. Driggers also claims that she was not permitted to explain or defend herself regarding the charges against her, but the record belies that assertion. She was interviewed numerous times by police officials, was represented by an attorney when potential charges were

presented to her, and subsequently waived the opportunity for a hearing before a quasi-judicial body regarding the charges. Such general denials cannot create a genuine issue of material fact for trial.

Driggers also argues that she has submitted evidence of sex stereotyping, asserting that Officers "Lee, Skeens, Kazlauskas, and Dixon expected Lisa Driggers to object to [Officer] Palmer's boisterous and aggressive behavior toward her instead of accepting and participating in such behavior." *Driggers' Br.* at 35. According to Driggers, the investigation of Palmer's conduct toward her— the event that precipitated all of her discrimination allegations—was initiated solely because of Defendants' sexist belief that she should not engage in macho banter with her male colleagues, but should act as if she needed male protection.

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a senior female manager had been denied partnership based on evaluations from other partners. *Id.* at 234–35. Some of these evaluations criticized Hopkins' interpersonal skills, calling her too aggressive and "macho" and stating that she "overcompensated for being a woman," that she should "take a course at charm school," and that a "lady" should not use foul language. *Id.* A male partner advised Hopkins that to make partner she should "walk more femininely, talk more femininely, dress more femininely, wear makeup, have her hair styled, and wear jewelry." *Id.* at 235. At trial, an expert psychologist testified that the partnership selection process had been influenced by sex stereotyping, as evidenced by, *inter alia,* the overtly sex-based comments. *Id.* The Court held, "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250.

We disagree that Driggers has submitted evidence of sex stereotyping. Driggers may dispute Defendants' intent behind the investigation of Palmer's conduct, but nothing in the record directly evidences sex stereotyping. Unlike the facts in *Price Waterhouse,* where the decisionmakers made overtly sexist comments during the selection process, none of the officers involved in the Palmer investigation made sexist comments in the context of the investigation. Driggers' interpretation of Defendants' conduct and her unsupported arguments about their true motives do not constitute evidence at all, let alone evidence of sex stereotyping.

## C. Retaliation Claim

To establish a retaliation claim under Kentucky law, the plaintiff, in making out a *prima facie* case, must show that (1) she engaged in a protected activity, (2) she was disadvantaged by an act of her employer, and (3) there was a causal connection between the activity engaged in and the employer's act. *Kentucky Ctr. for the Arts v. Handley,* 827 S.W.2d 697, 701 (Ky.Ct.App. 1991). If the employer articulates a legitimate, non-retaliatory reason for the decision, the employee must show that "but for" the protected activity, the adverse action would not have occurred. *Id.* (citation omitted).

We hold that the district court properly granted Defendants summary judgment on Driggers' retaliation claim. As discussed above, Driggers cannot show that she suffered an adverse employment action. She cannot create a triable issue that she suffered a constructive discharge, nor were any of the other negative experiences she had as a police officer tantamount to a materially adverse change in her employment.[4]

4. Contrary to Defendants' argument, we agree with Driggers that she satisfies the pro-

tected activity element of a retaliation claim. The Kentucky Civil Rights Act's anti-retalia-

■ Whether addressed at the *prima facie* stage or at the pretext stage, Driggers' retaliation claim also fails because there is no genuine issue of material fact of a causal connection between her complaints about discrimination and the end of her employment. As discussed above, Driggers cannot satisfy her burden of persuasion on the issue of whether Defendants' threat to bring charges against her for violation of departmental regulation was a pretext for retaliation. Driggers acknowledges that the event that set her eventual resignation in motion was Defendants' investigation of Palmer's conduct. Driggers further acknowledges that it was appropriate for Defendants to have commenced that investigation. Driggers merely disagrees with the conclusions of that investigation—namely, that Palmer had engaged in harassing and other inappropriate conduct, that Driggers had lied and asked another officer to lie to protect Palmer, and that several other officers had violated departmental regulations. Driggers does not allege, nor is there evidence to suggest, that EEO Officer Randolph, who reached these conclusions after an exhaustive investigation, was motivated by an intent to retaliate. Defendants relied on these conclusions to threaten Driggers with discipline. Given that three other officers (Lee, Palmer, and Smith) either were disciplined or resigned under the threat of discipline for engaging in the same or similarly serious conduct, we hold that a reasonable jury could not find that Driggers was a victim of retaliation when she resigned under the threat of discipline.

tion provision states, in relevant part, that it is unlawful to "retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by [the Civil Rights Act], or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [the Civil Rights Act]." KY.REV.STAT. ANN. § 344.280(1).

## D. First Amendment Claim

Driggers' complaint alleges that Defendants violated her rights to free speech, to freely associate with Officer Palmer, and to petition the City of Owensboro for redress of grievances. In her appellate brief, however, Driggers argues only that Defendants unconstitutionally interfered with her friendship with Officer Palmer by proposing to bring charges against Driggers for meeting with Palmer while off duty. She also argues that Defendants "destroy[ed]" Lieutenant Smith's career because of Driggers' friendship with him. *Driggers' Br.* at 46. Thus, she argues only that Defendants violated her First Amendment right of intimate association.

■ "Personal friendship is protected as an intimate association" under the First Amendment. *Akers v. McGinnis*, 352 F.3d 1030, 1039–40 (6th Cir.2003) (citing *Corrigan v. City of Newaygo*, 55 F.3d 1211, 1214–15 (6th Cir.1995)). A "direct and substantial interference" with intimate association is subject to strict scrutiny, but lesser interferences merely merit rational basis review. *Id.* at 1040 (quoting *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir.1996)). Only governmental restraints that "absolutely or largely" preclude the formation of intimate associations are subject to strict scrutiny. *Id.* Here, the relevant governmental restraint involved Defendants' prohibition of contact between Officers Driggers and Palmer because Palmer had been harassing Driggers and

Driggers filed no less than four EEO complaints with the City of Owensboro and orally complained to Captain Kazlauskas that her relationship with Officer Palmer was being singled out for investigation because of her sex. At a minimum, these complaints were protected "opposition" to what Driggers believed to be sex discrimination in the Police Department.

had made a death threat against her. This restraint had nothing whatsoever to do with friendships between police officers or anyone else, but targeted threatening and disruptive conduct. Assuming, *arguendo,* that Driggers and Palmer had an intimate association, both Driggers and Palmer remained free to befriend anyone else in the Department or the world at large. Any impact on their ability to form intimate associations was *de minimis* at best. Accordingly, Defendants' conduct is subject to rational basis review.

■ Under rational basis review, a proffered explanation for the governmental regulation of an intimate association need not be supported by "an exquisite evidentiary record; rather we will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose, even 'unsupported by evidence or empirical data.'" *Id.* at 1039 n. 3 (quoting *Craigmiles v. Giles,* 312 F.3d 220, 224 (6th Cir.2002)(quoting *FCC v. Beach Communications,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993))). We hold that Defendants' prohibition against Palmer from having contact with Driggers easily met the rational basis standard. After conducting a thorough investigation, Defendants had substantial evidence showing that Palmer had harassed and threatened Driggers and that Palmer's apparent obsession with Driggers had interfered with Palmer's duties as a police officer. Thus, in an effort to protect Driggers and to focus Palmer on his police duties, it was more than reasonable for Defendants to prohibit Palmer from having any contact with her, whether on or off duty. Indeed, Driggers admits that it was legitimate for the Police Department to react to Sergeant Lee's memo by separating Driggers and Palmer until the validity of the allegations set forth therein could be determined.

In any event, Defendants' imposition of the no-contact requirement had nothing to do with prohibiting friendships between officers, but was a collateral consequence of a harassment investigation that Driggers alleged was retaliatory. As such, Driggers' intimate association claim really is duplicative of her meritless retaliation claim. *See Henley v. Tullahoma City Sch. Sys.,* 84 Fed.Appx. 534, 543–44 (6th Cir.2003) (holding that alleged adverse actions plaintiffs suffered for engaging in protected speech did not pose a "direct and substantial" limitation on their intimate associations, but rather, were "collateral effects of Defendants' alleged intent to retaliate against protected speech") (citations omitted).

Similarly, Driggers' claim that Defendants interfered with her right of intimate association with Lieutenant Smith is meritless. What little evidence there is concerning Smith suggests that Defendants targeted Smith for discipline because of his inappropriate interactions with Driggers at work. Thus, any impediment to their relationship occasioned by threatened discipline was a collateral effect of Defendants' attempt to enforce its work rules. *See id.* Moreover, EEO Officer Randolph's investigation provided Defendants with a reason to suspect that such violations had occurred. Such rational speculation is sufficient to satisfy the rational basis standard, mandating dismissal of Driggers' First Amendment claim.

### III.

For all of the foregoing reasons, we **AFFIRM** the district court's order denying Driggers' motion for reconsideration of its order granting summary judgment in favor of Defendants.