NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0428n.06

No. 24-3230

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Oct 25, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| STEPHANIE SOLIS, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER, | ) | |
| Defendant-Appellee. | ) | OPINION |

Before: GRIFFIN, KETHLEDGE, and BUSH, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Plaintiff Stephanie Solis, an African American woman, brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. She alleges that her employer, The Ohio State University Wexner Medical Center (Wexner), denied her a promotion because of her race. The magistrate judge, presiding with the parties' consent, granted summary judgment in Wexner's favor. For the reasons set forth below, we **AFFIRM**.

**I.**

Stephanie Solis began working part-time as a staff nurse for Wexner's Ross Heart Hospital in 2011. The following year, she obtained her bachelor's degree in nursing and assumed a full-time position at the hospital. She has remained a staff nurse in a non-acute care unit her entire time at Wexner.

But Solis has long desired a job promotion to an Advanced Practice Provider (APP). APPs include both nurse practitioners and physician's assistants. Those jobs require advanced

certifications beyond a bachelor's degree in nursing, such as a master's degree and in some cases a doctorate-level degree. *See About Advanced Practice Providers (APPs),* Ohio State Medical Center (osu.edu), https://wexnermedical.osu.edu/departments/advanced-practice-provider/about.

Solis obtained an advanced certification in 2018, when she was certified as a Family Nurse Practitioner. After receiving that certification, Solis noted in her 2018 Personalized Performance Plan that she wanted to continue her education and one day apply for an APP position. A supervisor, Ajwad Farah, advised Solis that she would be more competitive for an APP position if she had more experience in acute care and received an Acute Care Nurse Practitioner certification. Solis did not heed this advice. In the years following her Family Nurse Practitioner certification, she did not pursue any significant experience or a certification in acute care. Instead, she continued working at her previous post as a staff nurse.

Nonetheless, between 2019 and 2022, Solis applied for over 89 APP positions, 39 of which she sought between January 2021 and August 2022. Solis was granted interviews for five of those positions but never received an offer. For this appeal, only one application, submitted in September 2021 for an APP Ross Heart Cardiology position, is at issue.

Solis was among 42 applicants for this job, and ultimately one of 21 candidates interviewed in person by a panel of nine different volunteer interviewers. After each interview, Ajwad Farah, the hiring manager, gathered feedback from the interviewers and recorded it in a color-coded spreadsheet. Ultimately, he assigned a color of green, yellow, or red to each applicant based on the feedback he received. As one might guess, a candidate highlighted in green advanced to the next interview round. Yellow candidates were put in an intermediate category; they were still being considered but the interviewers wanted more information. Finally, red-highlighted

candidates came to a full stop; they did not move forward in the interview process. Solis was one of those candidates whom Farah highlighted in red.

The interview process resulted in Daniel Wade, a Caucasian man, being selected for the position. Wade was a certified Primary Care Nurse Practitioner and had received his Master's of Science in Nursing in May 2021, approximately six months before assuming his APP position. Wexner claims that Wade was preferred over Solis because of his experience with using left ventricular assist device (LVAD) pumps for critical care patients and because he was a recent graduate of the Master's in Nursing program at The Ohio State University College of Nursing. According to Wexner, Wade's status as a recent graduate gave him fresh experience from his APP rotations, where he was taught how to be an acute care provider. His skills and muscle memory were sharp, and his understanding of the day-to-day requirements for acute care allowed him to be ready on day one. Solis, on the other hand, had obtained her Family Nurse Practitioner certification three years earlier but had no significant experience in acute care nursing. Nonetheless, Solis contends that Wexner discriminated against her because of her race by denying her the APP Cardiology promotion.

On September 13, 2022, Solis filed a formal complaint with the Ohio Civil Rights Commission, which was dual-filed with the Equal Employment Opportunity Commission, memorializing these claims of discrimination as violations of Title VII. In March 2023, Solis withdrew her administrative complaint. On April 21, 2023, she commenced this lawsuit in the District Court for the Southern District of Ohio, alleging two counts of race discrimination in violation of Title VII and Ohio state law.[1] The district court granted summary judgment in favor

---

[1] Solis's complaint also alleged that Wexner's failure to promote her to an APP Vascular Surgery position in 2022 violated Title VII. On appeal, Solis does not challenge the district court's grant of summary judgment regarding that position, so we do not address it further.

of Wexner and dismissed Solis's claims. In granting the motion, the district court held: (1) Solis established a prima facie case for race discrimination; (2) Wexner provided legitimate, nondiscriminatory reasons for not selecting Solis for either position; and (3) Solis failed to demonstrate that the hospital's proffered reasons for its hiring decisions were pretext for race discrimination. Solis timely appealed.

## II.

We review a district court's grant of summary judgment de novo. *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022). Summary judgment is warranted when "no genuine dispute of material fact" exists and "the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). As the movant, Wexner bears the initial burden of showing there is no dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Upon a successful showing, the burden shifts to Solis, who "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986) (quotations omitted). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At the summary judgment stage, we view all facts in the light most favorable to Solis. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

Title VII prohibits employers from discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1); *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023). The statute also grants employees a cause of action to challenge an employer's "discrete discriminatory acts" such as "termination, failure to promote, denial of

transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002); *see also Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009); *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (failure to promote constitutes an adverse employment action).

Solis does not rely on direct evidence to support her allegations of discrimination. So, we apply the longstanding burden-shifting test first articulated in *McDonnell Douglas Corp. v. Green* to evaluate the merits of her claim. 411 U.S. 792, 802–03 (1973); *see also Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). Under the *McDonnell Douglas* framework, Solis must first establish a prima facie case of discrimination by a preponderance of the evidence. 411 U.S. at 802. If she is successful, the burden shifts to Wexner to offer a "legitimate, nondiscriminatory reason" for its decision not to promote Solis. *Id.*; *Burdine*, 450 U.S. at 253. Should Wexner carry its burden, Solis then has an opportunity "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.

The district court held that Solis did not offer enough evidence to raise a genuine dispute of material fact as to pretext. Solis challenges this conclusion. We now turn to the *McDonnell Douglas* framework and its application here.

### A. Prima Facie Case

A valid race discrimination claim requires the plaintiff to first prove a prima facie case. *See Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). That burden is not onerous. *Burdine*, 450 U.S. at 253. The district court decided that Solis satisfied her burden, and Wexner does not dispute this conclusion on appeal. Accordingly, we proceed to the next step in the analysis.

### B. Legitimate, Nondiscriminatory Reason

The burden of production now shifts to Wexner to articulate a legitimate, nondiscriminatory reason for failing to promote her. *McDonnell Douglas*, 411 U.S. at 802; *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). The hospital does not need to establish that it was "actually motivated" by its reasons for choosing an alternative candidate. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011). Rather, it need only provide admissible evidence of a nondiscriminatory reason for not promoting Solis. *Id.* at 815.

Wexner selected Wade over Solis because his more recent nurse practitioner clinical rotations and his advanced experience with LVADs made him the superior candidate. On appeal, Solis does not challenge the district court's conclusion that the hospital put forward legitimate, nondiscriminatory reasons for its hiring decision. Rather, Solis takes issue with the district court's reliance on testimony by Ajwad Farah, the hiring manager for the APP Ross Heart position, to reach its ultimate conclusion that her employer met its burden of production.

We agree with the district court that Wexner's proffered reasons are not discriminatory. In support of its conclusion, the district court accepted Farah's testimony that Wade's status as a recent graduate meant that his foundational skills were "sharp" from completing recent clinical rotations. Solis, on the other hand, received her Family Nurse Practitioner certification three years prior and was therefore further removed from the day-to-day practice of caring for high-risk patients. Wexner has also consistently maintained that Wade's experience working as an acute care nurse made him the preferred candidate because the types of patients he served—cardiac patients in the intensive care unit, post-transplant patients, and post-cardiac surgical patients—are the types of patients a Cardiology APP sees in daily practice. Farah reasonably placed value on

Wade's ability to care for patients on day one, for who "better understands the relevant field and corresponding skills necessary to succeed than the employer?" *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1131–32 (6th Cir. 2020).

Solis makes two points in response. First, she states the district court "completely disregarded" her position that Farah is not a credible witness because he provided "conflicting testimony" at various times in his deposition. And second, she contends that the district court cannot draw inferences in favor of Wexner based solely on Farah's testimony. According to Solis, the hospital needed more than Farah's testimony to satisfy its burden at this stage of the analysis.

But Solis seeks to impose a higher burden than the *McDonnell Douglas* framework mandates. First, as Wexner notes, a "nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Solis must instead present affirmative evidence to defeat her employer's properly supported motion. *Id.* She has failed to do so. Solis does not dispute that either of Wexner's purposes for choosing Wade over Solis are illegitimate. Nor may she rely on subjective assertions about Farah's credibility to survive summary judgment. Second, the district court may rely on Farah's deposition testimony as admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Farah was the primary decision-maker, and his decision to hire Wade over Solis triggered this action. Accordingly, we find no fault in the district court's conclusion that Wexner has at least one legitimate reason for not selecting Solis. The hospital has defeated the presumption of discrimination by offering legitimate business reasons for denying Solis a promotion.

### C. Pretext

The burden now shifts back to Solis to "demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Provenzano*, 663 F.3d at 815. To do so, Solis must produce enough evidence such that a jury could reasonably reject Wexner's explanation and infer Wexner intentionally discriminated against her. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

A plaintiff may choose to show pretext through direct evidence that persuades the trier of fact "a discriminatory reason more likely motivated the employer," or through indirect evidence that shows "the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. But usually, a plaintiff can establish pretext by showing that the employer's proffered reasons "(1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action." *Stokes v. Detroit Pub. Sch*, 807 F. App'x 493, 500 (6th Cir. 2020) (cleaned up).

Here, Solis provided circumstantial evidence in her attempt to show pretext. She raised claims about Wexner's hiring motivations, alleged deviations from the hospital's hiring guidelines, highlighted the interviewers' subjective evaluations, and provided expert statistical evidence. But the district court found the weight of the evidence insufficient to establish a genuine issue of material fact. We agree, as explained below.

### i. Hiring Motivations

Solis contends that Wexner's first explanation for hiring Wade—his superior experience in caring for patients using LVAD pumps—cannot be its actual motivation. In support, Solis points to the job posting, which does not mention the need for LVAD experience anywhere. Additionally, she notes that she was not asked about LVAD experience during her interview, nor

do Farah's candidate evaluation notes mention LVAD experience as a prerequisite. She adds that if asked, she would have disclosed her relevant LVAD knowledge, too. Finally, she contends that the district court erred when it ignored and discredited her experience of caring for LVAD patients.

An employer is not "rigidly bound by the language in a job description." *Browning v. Dep't of Army*, 436 F.3d 692, 696 (6th Cir. 2006). Nor does Title VII "diminish lawful traditional management prerogatives in choosing among qualified candidates." *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). Here, Wexner was free to consider candidates' LVAD experience as a factor external to its posted job description when selecting among suitable applicants. *See id.* (In a Title VII case, "we look to the employer's motivation, not the applicant's perceptions, or even an objective assessment, of what qualifications are required for a particular position."). Contrary to Solis's belief, Wade's LVAD experience is not a "red herring" masking pretext. As Farah testified, Wade's duties as a nurse attending to patients with acute-care needs required a more advanced understanding of LVADs because of the patients' unstable conditions. Solis lacked this knowledge. Her patients generally did not require acute care, so she had less experience with LVADs. OSU was permitted to weigh Wade's LVAD-specific background in his favor when deciding whom to hire. *See id.*

Solis next argues that Wexner's second explanation—preference for recent graduates—is similarly baseless because Farah never received direct instruction to prefer recent graduates. She contends the hospital gave explicit instruction to its hiring managers that new graduates had to be cleared with APP directors before one could be hired. But Solis mischaracterizes the testimony of Brea McLaughlin, the hiring manager for the APP Vascular Surgery position. McLaughlin stated that she "received an email from a director . . . that we had to clear all new graduate APPs with our directors before offering hires." McLaughlin Dep., R. 23, PageID 831. She also clarified that

this is *not* a formal policy. *Id.* Contrary to Solis's opinion, McLaughlin's testimony does not mean Wexner had an explicit and generally applicable prohibition of hiring new graduates without higher approval. As the district court pointed out, Solis submits no evidence that shows Farah, in charge of a different APP program than McLaughlin, was given the same instruction.

Farah reasonably gave "greater weight" to Wade's particular LVAD experience and rotations as a recent graduate. *McDaniels v. Plymouth-Canton Cmty. Sch.*, 755 F. App'x 461, 470 (6th Cir. 2018) (employers may give greater weight to some qualifications over others). Farah believed Wade was the best fit for his team. And Farah's actions do not give rise to an inference of unlawful discrimination.

Finally, Solis contends that Wexner has shifted its stated reasons for hiring Wade over time, suggesting pretext. True, an "employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996); *see also Cicero v. Borg-Warner Auto.*, 280 F.3d 579, 587 (6th Cir. 2002) ("[S]hifting justifications over time calls the credibility of those justifications into question."). But we have recognized that "providing additional non-discriminatory reasons that do not conflict with the one stated at time of discharge does not constitute shifting justifications." *MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 F. App'x 718, 726 (6th Cir. 2012) (per curiam). Solis points to Farah's notes describing the interviewers' brief impressions of Wade post-interview as evidence that Farah's reasons shifted over time. His notes state the following for Wade: he has "strong communication skills professional and friendly, has cardiology nursing experience, interacted well with group, new NP but great 4 Ross RN." Farah Dep. II, R. 20-1, PageID 548.

Solis argues that these impressions are inconsistent with Farah's litigation testimony that Wade's more advanced LVAD experience made him a superior candidate. We disagree. The record reveals that Wexner has consistently noted Wade's significant experience in acute care as a rationale for preferring Wade over Solis. And during this litigation, the hospital has clarified that Wade's prior job as an acute care nurse required specific, advanced LVAD use that Solis did not see day-to-day as a staff nurse. Moreover, Farah offered additional insight into why he hired Wade over Solis that in no way contradicts the hospital's prior justifications. As previously noted, Farah, in a sworn deposition, stated that he preferred recent graduates because they have hands-on experience and strong muscle memory from recent rotations that can be applied to the APP job immediately. That additional reason does not constitute a "shifting justification" giving rise to pretext. Wexner did not abandon its initial hiring justification in lieu of another conflicting reason. Instead, it gave additional, permissible explanations for why Wade was the superior applicant.

### ii. Guideline Deviations

In opposing summary judgment, Solis argued below that her employer deviated from prescribed hiring guidelines. The district court held that the deviations in policy were minor and did not demonstrate that Wexner's legitimate reasons for not selecting Solis were pretextual. On appeal, Solis has abandoned this argument, so we leave the district court's ruling on this issue undisturbed.

### iii. Subjective Evaluations

Solis contends that the district court applied an incorrect legal standard in assessing her argument that the hospital's use of subjective evaluation criteria is evidence of discrimination. Though "subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination," such evaluations are not illegal per se. *Grano v. Dept. of Dev. of City of*

*Columbus*, 699 F.2d 836, 837 (6th Cir. 1983) (per curiam). Proof an employer used subjective criteria does not, without more, establish pretext. *Browning*, 436 F.3d at 697.

In this case, Solis points to Farah's interview spreadsheet and accompanying notes, describing her as "timid." Farah Dep. II, R. 20-1, PageID 548. She argues that this subjective criterion masks Wexner's discriminatory intent. She compares these notes to another interviewer, who reported that Solis was "very engaged." *Id.* According to Solis, because these two evaluations cannot be reconciled, the hospital's reliance on subjective criteria in its hiring decision must be evidence of discrimination. The district court disagreed, concluding that Solis did not clarify how her employer disguised its discriminatory action by using subjective criteria. Moreover, the district court analyzed the totality of Wexner's evaluation criteria and found that it did not solely, or even primarily, rely on the subjective opinions of the interviewers in deciding to hire Wade.

While we agree that the hospital used some subjective criteria in its candidate evaluation process, doing so does not demonstrate pretext. An employer may consider subjective factors like attitude, self-confidence, teamwork, and other nondiscriminatory criteria in its evaluation process. *Cf. Conner v. State Farm Mut. Auto. Ins. Co.*, 273 F. App'x 438, 443 (6th Cir. 2008). And in fact, the job description put applicants on notice that these factors would be considered. More still, it is not within the court's purview to investigate how Farah weighed candidates' subjective qualities such as "teamwork" and "customer focused", Def. Mot. Summ. J., R. 25-1, PageID 1429, when making the ultimate hiring decision. *See Browning*, 436 F.3d at 698. The law does not require Wexner to make a perfect decision, nor does it forbid the hospital from making decisions that Solis disagrees with. *Hatsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996). Solis may oppose the interviewers' ultimate conclusions about how she faired throughout the interview process, but

without more, she has not shown that Wexner acted with a discriminatory motive when placing secondary value on certain subjective qualities.

### iv. Statistical Evidence

Next, Solis contends that the district court erroneously concluded that her statistical evidence was insufficient to establish pretext. Statistical evidence may evince pretext when the statistics indicate a disproportionate pattern of conduct, such as hiring or firing, toward a protected group. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466–68 (6th Cir. 1990). But this court, among others, has recognized three possible explanations for disproportionality: "the operation of legitimate selection criteria, chance, or the defendant's bias." *Id.* Moreover, for statistical data to be considered valid and valuable to the pretext analysis, it must encompass the relevant labor market. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977). The "relevant labor market" is defined as the number of minority applicants actually qualified for the job, also called the "qualified labor pool." *Id.*; *see also Hawkins v. Memphis Light Gas & Water*, 520 F. App'x 316, 322 (6th Cir. 2013) (factfinder needs statistical evidence of "the racial composition of the pool of qualified candidates" to determine whether bias motivated the employer).

While the relevant labor market may vary from case to case, we have been hesitant to allow a national comparator to inform courts of the relevant labor market without evidence supporting its probative value. *Hazelwood*, 433 U.S. at 309 n.13 ("When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value."); *see also Driggers v. City of Owensburg*, 110 F. App'x 499, 509 (6th Cir. 2004) (per curiam) (comparing statistic of women in the workforce nationwide to percentage of women in the city police force "fails to compare the gender composition of the police force to the qualified population in the

relevant labor market"); *Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 358 (6th Cir. 2012) (determining that the relevant labor market is the "qualified administrator candidates in the [local] teaching market," not the broader student population).

Here, Solis's expert did not use the correct comparator. This expert used the Chi-Square test to compare the expected number of African American APPs employed by Wexner to the actual number. Using the Bureau of Labor's national statistic of the percentage of African American APPs employed in the United States as the comparator, the expert concluded that the expected number of APPs at the hospital (85) was significantly higher than the actual number of two. Solis's expert concluded that this significant statistical difference in the "University's observed pattern of APP hiring could not be due to random chance." Rosen Aff. & Report, R. 26-2, PageID 1479.

The district court gave two reasons for why Solis's statistics do not create a genuine dispute of material fact. First, the court observed that because Wexner does not require applicants or employees to disclose their race, the number of African American APPs that the expert assumed to be working at the hospital may not be accurate. Second, the district court concluded that the expert's analysis failed to compare the protected group to the qualified population in the relevant labor market.

We agree that the appropriate labor market comparator is the number of qualified African American APPs in the Columbus area, not the United States as a whole. The record here indicates that the Greater Columbus area is the proper comparator and is further supported by the fact that Wade, as the chosen applicant, had relevant experience working internally at the hospital prior to being selected for the APP Cardiology position.

Moreover, Solis provides no reason why we should inflate the relevant labor market to a national standard, or even a standard broader than the greater Columbus region. Evidence in

support of an expanded labor market might include a showing that Wexner considers a wide range of qualified applicants outside the Columbus area or that interested APP candidates in the past hailed from other cities. *See e.g.*, *Hazelwood*, 433 U.S. at 308 n.13 (finding data showing percentage of white and black applicants "very relevant" to defining relevant labor market); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1287 (5th Cir. 1994) ("Actual applicant flow figures are the preferred method by which to measure an employer's hiring practice and performance."); *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 302 (7th Cir. 1991) (the relevant labor market requires identifying both qualified potential applicants and interested potential applicants).

Solis asks us to rely on *Hopson v. DaimlerChysler Corp.* to find that a genuine dispute of material fact exists. 306 F.3d 427 (6th Cir. 2002). There, an African American security guard applied to seven different internal job openings for security management positions within the company. *Id.* at 429. Each time, he was rejected, without an interview, in favor of a white employee. *Id.* at 436. This court concluded that for each of the rejections, the employer's proffered nondiscriminatory reason was at best vague, and the employer "failed to specify the manner in which white employees were better qualified, or the degrees of difference in the annual evaluations" that led to the hiring decisions. *Id.* In addition to circumstantial evidence in the form of deposition testimony corroborating the plaintiff's account that he was not selected because of his race, the plaintiff also submitted an affidavit from an economist. *Id.* at 437. The economist observed that the difference between the percentage of black security managers employed by the defendant (18.5%) was significantly less than the percentage of black security guards employed (34.8%), and this statistical disparity indicated that "African-Americans are under-represented in supervisory and management positions in the company's security operations." *Id.* This court held

that the statistical evidence combined with the additional circumstantial evidence was enough to raise a genuine dispute of material fact with respect to whether the defendant's actions were pretextual. *Id.* at 438. Consequently, the panel reversed the district court's grant of summary judgment to the defendant-employer. *Id.* at 439.

But Solis's reliance on *Hopson* is misplaced. The *Hopson* expert used the proper relevant labor market statistics in its analysis. *See id.* at 437. Indeed, the defendant did not dispute that the relevant labor pool consisted of the percentage of black security guards employed by the defendant compared to the protected group in question. *Id.* The relevant labor market was appropriately tailored to the qualified pool of applicants. *Id.* There is also no reason to believe that the numbers used in the *Hopson* statistical analysis were uncertain. By contrast, here, Wexner disputes the expert's definition of the relevant labor market as overly broad, and Solis has not offered any support for why a national standard, as opposed to a local one, should be used. The alleged statistical difference that Solis's expert found cannot be considered significant unless validated by the proper comparator. Or at the very least, Solis needs evidence that shows the actual number of African American APPs employed by the hospital was less than 1% when she applied for the positions.

Finally, Solis attempts to point to the "dramatically different hiring experiences" for white applicants compared to black applicants as additional circumstantial evidence of pretext. In support, Solis indicates that she has applied for 89 APP positions at Wexner but has not been selected for a single one, while her white counterparts "were hired for the fifth and sixth APP positions to which they applied." Opening Br. at 30. But Solis cannot survive summary judgment by relying on "simplistic percentage comparisons" or "small sample sizes." *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir. 2008); *see Gambill v. Duke Energy*

*Corp.*, 456 F. App'x 578, 588 (6th Cir. 2012); *see also Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 621 (1974) (considering the district court's "concern for the smallness of the sample presented" to be "well founded"); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (sample size of seventeen people was "suspect"). Her claim does not move the needle. Solis uses herself as the only point of comparison to just three other APP applicants, which is too small a sample size to credibly draw any inference of pretext. The district court correctly held that Solis's evidence does not demonstrate the statistical significance necessary for a finding of pretext.

Even if we decided that Solis's statistical evidence casts doubt on Wexner's nondiscriminatory reasons for declining her a promotion, more circumstantial evidence is needed. *See Hopson*, 306 F.3d at 437–38 (a plaintiff raises a genuine issue of material fact regarding the defendant's proffered nondiscriminatory reasons where "significant statistics are coupled with independent circumstantial evidence of discrimination"). Given the absence of statistical data supporting an inference of pretext and other independent circumstantial evidence of discrimination, Solis fails to satisfy her burden of showing that the hospital's stated reasons for hiring Wade over her were pretext for discrimination.

**IV.**

For the reasons stated above, we **AFFIRM** the district court's judgment.