**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0277n.06
Filed: April 25, 2006

**No. 04-4399**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ROBERT WILSON,

      Plaintiff-Appellant,

v.

STATE OF OHIO, DEPARTMENT
OF JOB & FAMILY SERVICES,

      Defendant-Appellee.

_____/

**ON APPEAL** FROM THE
UNITED STATES DISTRICT
COURT FOR THE
SOUTHERN DISTRICT OF
OHIO

**BEFORE:** **NORRIS and BATCHELDER, Circuit Judges, and COHN, District Judge**[*]

      **AVERN COHN, District Judge.** This is an employment discrimination case.

Plaintiff-Appellant Robert Wilson (Wilson) appeals from the district court's grant of

summary judgment to defendant-appellee the State of Ohio Department of Job & Family

Services (ODJFS) and Antoniette Veno–Golden (Veno-Golden).[1] Wilson claimed

reverse sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964

_____

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

[1] The district court dismissed Wilson's claims against Veno-Golden on the grounds that
Title VII does not provide for individual liability. Wilson does not challenge the ruling;
therefore, the ODJFS is the sole defendant on appeal.

and equal protection and due process violations under 42 U.S.C. § 1983. Wilson also appeals from the district court's order denying his motion for relief from judgment under Fed. R. Civ. P. 60(b), although he did not file a separate appeal from the order. For the reasons that follow, the decision of the district court will be affirmed.

## I. BACKGROUND

The facts are, for the most part, uncontested. Wilson began working for the State of Ohio in 1996 for the Bureau of Business Management (BBM) as a real Estate Administrator I, with the title of Chief of Land and Buildings. His supervisors were Guy Edmunds (Edmunds), Assistant Chief of the BBM, and Rosby Lee (Lee), Chief of the BBM. The BBM was a department of the Ohio Bureau of Employment Services (OBES). As Chief of Land and Buildings, Wilson's responsibilities included planning and purchasing of leased OBES properties, drafting relevant documents, and supervising the buying, selling, leasing, construction and maintenance of OBES properties. In addition, Wilson directly supervised a facility planning project manager (who in turn supervised two facility planners), a maintenance supervisor (who in turn supervised three more staff), two leasing agents, and one secretary. Wilson also oversaw a computer aided design (CAD) team of several persons. As to his leasing-related responsibilities, Wilson explained that while almost all state agencies relied on the Ohio Department of Administrative Services (ODAS) to negotiate and manage their leases, the OBES performed this function internally and was, therefore, "kind of unique."

For a period of ten years, prior to working for the state of Ohio, Wilson was a licensed real estate broker, held an insurance license, and owned a number of real estate

2

construction and development companies.

Veno-Golden headed another agency, the Bureau of General Services (BGS) which was a department within the Ohio Department of Human Services (ODHS). Veno-Golden was essentially Lee's counterpart. The BBM and the BGS performed substantially the same functions. The ODHS, unlike the ODAS, however, did not negotiate its own leases.

In 1999, the Ohio legislature enacted House Bill 470 which required the merger of the OBES and the ODHS into the ODJFS. The merger affected approximately 4,000 employees. The relevant portion of H.B. 470, section 19, provides as follows:

> From July 1, 2000 to June 30, 2002, the Director of Job and Family Services is given authority to restructure the ODJFS, and the Director's actions are not subject to appeal to the State Personnel Board of Review. The Director may establish, change, and abolish ODJES positions and assign, reassign, reclassify, transfer, reduce, promote, or demote all ODJFS employees who are not subject to collective bargaining. The Director's authority includes assigning or reassigning an exempt employee, as defined in section 124.152 of the Revised Code, to a barganing unit classification if the Director determines that such a classification is appropriate. The Director's actions must be consistent with federal regulations governing a merit system of personnel administration.
> If any employee in the E-1 pay range is to be assigned, reassigned, classified, reclassfied, transferred, reduced, or demoted to a position in a lower classfication, the Director ... must assign that employee to Step X, and the employee may not receive an increase in compensation until the maximum rate of pay for that classification exceeeds the employee's compensation.

The governor appointed Jacqueline Romer-Sensky as Director of the ODJFS. Julia Carter, a former Deputy Director of OBES, became Deputy Director of the Bureau of Internal Administration, a department of ODJFS, and led the merger. Veno-Golden became Carter's Assistant Deputy Director. Lee became a Bureau Chief.

The merger required Lee and Veno-Golden to prepare tables of organization for

3

ODJFS indicating which employees would perform what functions within the new organization. Apparently, Veno-Golden's tables of organization were approved, Lee's were not. Wilson continued to work under Lee, apparently at Lee's request.

Wilson says his job duties began to change prior to the merger. Between February and June 2000, the CAD team was reassigned from Wilson's supervision to Veno-Golden's supervision and moved to a different location. Wilson stated in an affidavit, however, that his department had not designed new office spaces since the summer of 1999, and therefore had no need for CAD draftspersons since that time.

After the merger, in August 2000, the leasing, sales, and acquisition aspects of Wilson's job were transferred to Denise Durbin, the Facilities Manager at ODHS, who was essentially Wilson's counterpart. The leasing agents under Wilson were also transferred. Durbin reported to Lee.

In October 2000, Lee assigned Wilson to assume telecommunications-related duties under the supervision of Andrea Lentz, due to the disability leave of Chester White. Wilson's title then became Interim Chief of Telecommunications. Wilson did not supervise any employees in this role. This position involved overseeing the installation of telephone lines for the new agency. Wilson was assigned a technical expert as well as subcontrators. Wilson complained to Lee that he was not qualified to perform the duties required of him and believed that his lack of qualifications and subsequent failure of the project would be used to justify his discharge. Although Wilson says he was not qualified for the position, he now also says that he was more qualified than his successor, Sharon Kocher.

In November 2000, Wilson was assigned to oversee a demarcation project concerning the removal and replacement of various aspects of the infrastructure at the Ohio Supreme Court building. Lentz became his supervisor and Wilson was given the title Acting Chief of Telecommunications. Wilson continued to complain - to both Lentz and Veno-Golden - that he was not qualified for the position.

In February 2001, Wilson says he learned of a plan to eliminate male managers from the ODJFS. Edmunds told Wilson that another ODJFS employee, Samme Jacks (Jacks), told him that Veno-Golden hated men and was plotting to eliminate them from management. Edmunds also apparently told Wilson that Jacks claimed that he heard Veno-Golden refer to men as "pig f–kers." Edmunds also told Wilson that when reviewing reorganization tables for the merger, Veno-Golden put a check mark next to the name of males, stating "he's gone."

Also in February 2001, Wilson met with Jacks and other male ODJFS employees, including Edmunds and Marvin Giles, at a local McDonald's. At the meeting, Wilson says that Jacks reiterated Veno-Golden's dislike for men.

In late February 2001, Wilson filed a complaint with the state's Equal Employment Office claiming sex/gender discrimination. The complaint was based on the theory that Veno-Golden had a hatred towards men and wanted to advance women within the ODJFS by removing males from their positions. It is not clear what happened with the complaint.

In April 2001, Wilson filed a complaint with the Ohio Civil Rights Commission alleging the same sex/gender discrimination and adding a claim of retaliation alleging that his job duties were stripped because he filed a charge. Wilson eventually received a right

to sue letter for this complaint.

In April or May 2001, upon completion of the demarcation project, Kocher took over the remainder of Wilson's telecommunications duties and Wilson was transferred to a warehouse location. Wilson says that from May 2001 until November 2001, he was given little work; the ODJFS characterizes Wilson's status as being "temporarily misplaced in the reorganization shuffle." He apparently brought books from home to read while working. There is no indication in the record, however, that Wilson ever informed anyone at the ODJFS that he was in need of work.

From May to November 2001, Wilson says he was given little work. In November 2001, Wilson was reassigned to a Researcher III position in the Office of Child Support, a bargaining unit position. Wilson remains in that position to date and apparently believes that he is also not qualified for this position.

## II. DISCUSSION

### A. Standard of Review

We review an order granting summary judgment *de novo*. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### B. Discrimination Claim

In order to establish a Title VII employment discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that

would allow an inference of discriminatory treatment.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (setting forth the requirements for racial discrimination claims).  Wilson contends that the record includes both direct and circumstantial evidence of discrimination.  Both possibilities are examined below.

### 1.  Whether Wilson provided admissible evidence of direct discrimination

Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  We have explained that "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (internal citations omitted).

Wilson references several pieces of the record to support his claim of discrimination.  First, Wilson says that Veno-Golden's reference to men as "pig f–kers" equates to discrminatory animus based on sex.  The district court determined that the use of this phrase did not, as a matter of law, constitute direct evidence.  We agree.  As the district court explained, "such a comment on its own requires an inference to conclude

7

that sexist consideration motivated the employment decisions of which plaintiff complains." Because it requires such an inference, it cannot be said to be direct evidence of sex discrimination.

Wilson also points to Veno-Golden checking off names of male employees on the tables of reorganization and stating they would be "gone." Veno-Golden's statement was apparently heard by Jacks and then communicated to Wilson and others. The district court, *sua sponte*, raised the issue of whether such a statement is hearsay and ultimately concluded that the statement was hearsay. As explained below, we agree.

As an initial matter, the district court was correct in raising the issue of the admissibility of the statement. It is clear that, in responding to a motion for summary judgment, Wilson must produce *admissible* evidence to create a genuine issue of material fact.

Wilson says that Jacks' statement to Wilson, Edmunds, and Giles about what Veno-Golden said is not hearsay under Fed. R. Evid. 801(d)(2)(D). A statement is not hearsay under this rule if it is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." As the district court noted, and despite Wilson's arguments to the contrary, there is no evidence in the record that the statement falls within the scope of Jacks' authority or to those to whom he communicated. Wilson says that because it was Jacks' job, as an assistant to Veno-Golden, to be present for discussions about the reorganization tables, the statement was within the scope of his authority. Wilson, however, was not responsible for making sure Von-Golden did not discriminate. As such, his statement

8

does not fall under 801(d)(2)(D).

Moreover, the statement does not fall under the "residual exception" to the hearsay rule under Fed. R. Civ. P. 807. While Wilson says that the statement has circumstantial guarantees of trustworthiness because Wilson and two other people (Edmunds and Giles) also heard the statement, the real problem is that the declarant himself - Jacks - does not recall making such a statement. Thus, the statement cannot be said to be sufficiently reliable so as to become admissible. In short, the statement is not admissible and therefore cannot be used to support Wilson's discrimination claim.

Finally, Wilson points to various remarks allegedly made by Veno-Golden in Jacks' presence regarding her feelings towards men. As the ODJFS points out, however, Veno-Golden's alleged statements are nothing more that "stray remarks" which are not direct evidence of discrimination. Moreover, Jacks' opinions about Veno-Golden's alleged discriminatory viewpoint is not direct evidence. Conclusory allegations and subjective beliefs are insufficient to establish a genuine issue of material fact. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 584 (6th Cir. 1992).

In sum, the district court did not err in concluding that Wilson failed to make out a case of discrimination based on direct evidence.

### 2. Whether Wilson provided circumstantial evidence of discrimination

### a. Legal Standard

Where there is no direct evidence of race discrimination, a plaintiff may prove a *prima facie* case of racial discrimination by showing that he or she: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment action;

9

and; (4) was treated differently than similarly situated members outside the protected class.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000) (internal quotation marks omitted). If the defendant is able to satisfy this burden, the plaintiff must then "prove that the proffered reason was actually a pretext to hide unlawful discrimination."  *Id.*

A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).  Regardless of which option is used, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him."  *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (alteration in original) (internal quotation marks and citation omitted).

### i.  This is a reverse sex discrimination case

The proper legal standard has been a rather thorny issue in this case.  The district court *sua sponte* analyzed the case as a reduction in force case, which alters the analysis under the forth prong.  Before deciding whether this is a reduction in force case, however, the parties and the district court failed to note that this is a *reverse* sex discrimination

10

case. On appeal, however, the ODJFS cites the standard applicable to reverse discrimination cases, but concedes that it did not cite this standard to the district court.

In adapting the *McDonnell Douglas* test to cases of reverse discrimination, this Court has held that, under the first prong, a plaintiff must demonstrate "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (quoting *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)); *see also Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 256 (6th Cir. 2002) (stating that such evidence "justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely"). To satisfy the fourth prong, a plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class. *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). There can be no question that the standard applicable to reverse discrimination cases must be applied to this case because Wilson is a male.

### ii. This is a reduction in force case

The parties disagree on whether this is a reduction in force (RIF) case. In *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (1990) a panel of this Court defined a RIF as follows:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related

11

work.

Wilson says that there was no RIF because although many people were reclassified, transferred, or demoted, no one, including himself, was terminated. This argument is not well-taken. There is no requirement that a RIF involve terminations; a RIF merely requires that positions be eliminated. Indeed, a panel of this Court analyzed a discrimination case under the RIF standard where the defendant company reorganized and the plaintiff was demoted, not fired. *See Gatch v. Milacron, Inc.*, 111 Fed. Appx. 785 (6th Cir. Aug. 31, 2004).

The key inquiry into whether a RIF is involved is whether or not Wilson was replaced. Under *Barnes*, Wilson was not replaced if (1) another employee was assigned to perform Wilson's former duties in addition to that employee's own duties; or (2) Wilson's former duties were redistributed among other existing employees. *See Barnes*, 896 F.2d at 1465.

Here, Wilson says he was replaced by Denise Durbin. This assertion is not supported by the record. Prior to the merger, Durbin was Chief of Facility Leasing and Contract for ODHS and, as stated above, was essentially Wilson's counterpart in the ODHS. After the merger, she performed her job for both ODHS and OBES sites. In other words, Wilson and Durbin's positions were combined into one, which clearly does not meet the definition of replacement. Moreover, the clear thrust of H.B. 470 was to eliminate, reduce, and reclassify positions within the two agencies - the hallmark of a RIF situation.

Because a RIF is involved, the fourth prong of the prima facie test is modified and

12

Wilson must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id*.

### b. Application

As to the first prong, the district court found that it was satisfied because Wilson is a male. This finding, however, is problematic because this is a reverse discrimination case and Wilson made no attempt to provide background circumstances to show that the ODJFs is the unusual employer who discriminates against the majority. Thus, it is very debatable whether Wilson has met the first prong of his prima facie case.

Assuming, arguendo, that Wilson has met the first prong, it is not disputed on appeal that the second and third prongs - whether Wilson suffered an adverse employment action and whether he was qualified for the position from which he was removed - are satisfied. Thus, the only issue is whether Wilson has met his burden with respect to the fourth prong. The district court found that Wilson had not, explaining:

> Plaintiff has established that as he moved from job to job in a workforce reduction that affected some 4000 persons, his work was taken over by women. This, by itself, does not satisfy the fourth prong. Moreover, plaintiff has provided no evidence that the reorganization affected men more adversely than it affected women. Even on a smaller scale, there is no evidence that Ms. Veno-Golden's decisions concerning male employees were statistically different or more favorable than those affecting women. Plaintiff has not offered additional evidence to prove that he was singled out for such treatment because he is male.

We agree. The record simply is devoid of the kind of evidence Wilson needs to meet his prima facie case.

Even if Wilson made out a prima facie case, he must still demonstrate that the ODJF's proffered reason - the RIF - is pretextual. Wilson says that pretext is established

13

because the merger process required that so called "best practices" be used in determining reassignments and that he was more qualified than Durbin and others who took over his job duties. As evidence, Wilson says he was never asked about his qualifications. Assuming the ODJFS had such a "best practices" requirement, this fact, even if true, does not establish pretext. Wilson also points to three other male co-workers - Evan, Edmunds, and Lee - who were affected by the merger and ultimately had their positions assigned to females although he says were more qualified. Allegations regarding four persons out of a 4,000-person reorganization is not statistically significant or sufficient to show pretext.

### C. Retaliation Claim

Wilson also claims the ODJFS retaliated against him for filing an internal complaint with the EEO and a subsequent complaint with the EEOC. To establish a prima facie case of retaliation, Wilson must show that he: (1) "engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff ...; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

The district court found that Wilson failed to meet the second and fourth prongs. As to the second prong, the district court held that there was no assertion or evidence that the ODJFS knew of Wilson's complaints. Wilson, however, says that Veno-Golden was aware of his complaints because she participated in preparing the company's response.

14

Even assuming this meets the second prong, Wilson still fails at the fourth prong because he cannot show a causal connection between the protected activity and the alleged adverse employment action. Wilson says that he was retaliated against when he was completely removed from the real estate field and placed in the Researcher position with the Office of Child Support. Wilson, however, had lost most of his responsibilities as Chief of Land and Buildings by August 2000. He filed his complaints in 2001. It is simply not possible for events occurring prior to the filing of his complaints to be the basis for a retaliation claim. In short, Wilson has not made out a claim for retaliation sufficient to survive summary judgment. The district court did not err in concluding the same.

### D.  Equal Protection Claim

Wilson also says that there are genuine issues of material fact as to his equal protection claim under 42 U.S.C. § 1983. Because Wilson's Title VII claim fails, so must his § 1983 claim. *See Morris*, 201 F.3d at 794 (stating that a showing under a § 1983 equal protection claim in an employment discrimination claim mirrors the showing under Title VII claim).

### E.  The Rule 60(b) Motion

Wilson filed a motion for relief from judgment under Fed. R. Civ. P. 60(b) on the grounds that the district court's *sua sponte* analysis of his Title VII claim under a RIF standard was erroneous and that he should be afforded an opportunity for additional discovery. Wilson raises this issue again on appeal.

As the ODFJS points out, however, Wilson did not file a notice of appeal from the

15

district court's order denying him Rule 60(b) relief. Although Wilson filed a motion in the district court to stay entry of the judgment so that the district court could consider his 60(b) motion, he never followed up with a separate notice of appeal from the denial of the 60(b) motion. As such, we do not have jurisdiction to consider the issues raised in the Rule 60(b) motion. *See United States v. Universal Management Servs. Inc.*, 191 F3d 750 (6th Cir. 1999) (holding that the court lacked jurisdiction to consider issues raised in a motion for reconsideration when notice of appeal referenced only the judgment entered following summary judgment and no notice of appeal was filed after entry of the order denying reconsideration).

Even assuming Wilson properly preserved his appellate rights, his argument with regard to the district court's Rule 60(b) decision lacks merit. To be clear, the district court did not grant summary judgment *sua sponte*, it merely applied the correct legal standard, which both parties failed to cite to the court. The district court had an obligation to apply the correct legal standard regardless of whether the parties correctly articulated it. We have the same obligation in applying the standard applicable to reverse race discrimination cases.

Moreover, Wilson cannot establish any prejudice as a result of the district court's actions as this Court has given him a *de novo* review of the district court's summary judgment decision, including whether the RIF standard is applicable.

Wilson's argument that he should be afforded discovery on the RIF issue is not well-taken. As the district court noted, a motion for summary judgment does not shape the scope of discovery; discovery is completed before the motion is filed. Wilson also

16

cannot point to, with any degree of specificity, what kind of evidence he would have sought to discover had he recognized that the case involved a RIF. Wilson says he would have requested information on all decisions made byVeno-Golden, regarding the merger, which pertain to the proposed and actual placement of employees, including but not limited to transfers, reassignments, promotions, demotions, and terminations. This type of information should have been requested, and was likely requested, as part of Wilson's discrimination claims in general.

## III.  CONCLUSION

For the reasons stated above, the decision of the district court is AFFIRMED.