**Marilyn Faye COLE, Plaintiff,**

**v.**

**Andrew TABER, et al., Defendants.**

**No. 05–2845 Ma/P.**

United States District Court,
W.D. Tennessee,
Western Division.

July 9, 2008.

trial date for them to prepare for and partici- pate in an overseas deposition. I disagree.

Ronald C. Wilson, Wilson & Associates PA, West Memphis, AR, for Plaintiff.

Hite McLean, Jr., Law Offices of Hite McLean, Jr., Memphis, TN, for Defendants.

### ORDER GRANTING DEFENDANT SHELBY COUNTY'S MOTION FOR SUMMARY JUDGMENT

SAMUEL H. MAYS, Jr., District Judge.

Plaintiff Myra Faye Cole sues Defendants Shelby County Government ("Shelby County"), and, in their individual and official capacities, the Director of the Shelby County Division of Corrections, George Little, Deputy Director Andrew Taber, Chief of Security Anthony Alexander, and

Lieutenant Edgar Hampton.[1] Plaintiff alleges violation of 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, 42 U.S.C § 1981, and the First and Fourteenth Amendments to the United States Constitution.[2]

On January 25, 2008, Defendant Shelby County filed a motion for summary judgment. Plaintiff responded on March 25, 2008. For the following reasons, Defendant Shelby County's motion for summary judgment is GRANTED.

## I. Background

Plaintiff Marilyn Faye Cole was formerly employed by the Shelby County Division of Corrections ("DOC"). (Undisputed Material Facts "UMF" ¶ 1.)[3] She started at the DOC in 1985 as a clerk, but was later transferred to security where she worked as a correctional officer beginning in 1987. (*Id.* ¶ 1–2.) Cole retired from the DOC on December 14, 2007, while still a correctional officer. (*Id.* ¶ 3.)

Cole is flat-footed, has ruptured tendons in both feet, and has developed degenerative joint disease as result of extensive standing and walking. (*Id.* ¶ 5.) However, she has never asked her physician to certify that her foot problems are work-related and does not dispute Defendant's contention that they are not the result of an on-the-job injury. (*Id.* ¶¶ 7, 91.)

In 1998, Cole applied for disability retirement on the basis of her foot pain. (*Id.* ¶ 8.) After her request was denied, she applied for a permanent work accommodation based on her inability to walk or stand for extended periods of time. (*Id.* ¶ 9.) Cole was temporarily assigned to visitation duty (a light duty post and, in her opinion, a reasonable accommodation), but was later forced to return to her original post. (*Id.* ¶¶ 9–10.)

On February 10, 1999, then DOC Director Mark Luttrell, Jr. issued an official memorandum on the subject of light duty. (*Id.* ¶ 12.) In pertinent part, it reads:

> The work performed by Correction Officers and Care & Custody Counselors is recognized to be demanding, challenging, and at times, hazardous. . . .

> The Division of Corrections has always temporarily excused Correctional Officers and Counselors from performing all of the essential duties of their position in case where recovery from injury or illness was needed. These "light duty" or "limited duty" assignments required the employee and their physician to certify that the injury or illness would allow a return to full duty within a reasonable time. Some employees have misunderstood this policy and have recently provided the Division with requests that they be provided permanent "light duty" assignments. All of these recent requests have been due to off-duty accidents or illness and have seriously affected the Division's ability to staff posts fairly, and with fully fit Corrections workers. . . .

> Effective February 15, 1999, the Division will only assign Correction Officers and Counselors to "light duty" posts in extraordinary cases involving minimal

---

1. All claims against Defendant George Little were dismissed by this court's order on motion to dismiss of October 4, 2007.

2. Plaintiff's claims under § 1981, and all individual capacity claims under Title VII and the ADA were dismissed by this court's order on motion to dismiss of October 4, 2007.

3. The UMF were submitted by Defendant along with its motion for summary judgment. Plaintiff responded to the UMF and, in most cases, agreed with Defendant. Only those facts in the UMF on which the parties agree are included in the Background section.

restriction of duties, and for a specific time period. In most cases, the light duty period will not exceed twenty (20) workdays....

It is important to know that these policies do not apply to On–the–Job–Injury (OJI) cases. On–the–Job–Injury cases will continue to be handled according to existing County policy....

(Def.'s Exh. 2 at 2–3.)

In 2002, Cole was assigned to a post in the east wing of the women's building, which required extensive standing and walking. (UMF ¶ 19.) After experiencing foot pain and swelling, Cole met with DOC Director Andrew Taber to discuss an assignment to a control center post, a light duty position. (*Id.* ¶ 20.) Cole was thereafter assigned to a variety of light duty control center posts for the remainder of 2002 and throughout 2003. (*Id.* ¶¶ 21–22.)

Beginning in 2004, however, Cole was no longer assigned to control posts. (*Id.* ¶ 23.) This change prompted her to file a charge with the Equal Employment Opportunity Commission ("EEOC"). (*Id.*) Dated April 28, 2004, the EEOC charge reads:

I have been denied a reasonable accommodation on a permanent basis. I am classified as a Correctional Officer and have been employed since February 1985.

I believe I have been discriminated against because of my disability (Rupture Tendon & Degenerative Joint Disease) in violation of the Americans with Disabilities Act (ADA)[.] Additionally, I believe I have been discriminated against because of my sex (female) and in retaliation for filing previous charges of discrimination and a federal lawsuit against the employer in violation of Title VII of the Civil Rights Act of 1964, as amended, because the employer has denied me a reasonable accommodation; however, it has assigned a male employee (Warren Tillman) to a job assignment which does not involve extensive walking and prolong [sic] standing.

(Def.'s Exh. 2 at 7.)

On December 5, 2004, Cole wrote Shelby County Mayor A C Wharton to complain of "harassment" by an internal affairs officer who questioned her about inappropriate emails which had been sent around the DOC. (UMF ¶ 27, Def.'s Exh. 2 at 2–3.) The following January, she was "reassigned." [4] (UMF ¶ 29.) Then, on January

---

4. The meaning and/or significance of Cole's reassignment is unclear. Defendant's undisputed material facts (agreed to, in pertinent part, by Plaintiff) state that Cole was reasonably accommodated from sometime in 2002 until sometime in 2004. (*See* UMF ¶¶ 22–23, Cole Depo. at 64.) This appears inconsistent with other exchanges in Cole's Deposition which suggest that reasonable accommodation did not cease until her reassignment in 2005 (following her December 2004 letter to Mayor Wharton):

Q. You said you spoke with Andrew Taber in 2002 about being reassigned to a control center post, and as a result of that conversation, you were reassigned to a control center post; is that correct?
A. That's correct.
Q. You said for a while, then something happened. What happened?
A. In 2004, I wrote a complaint against a manager, and ever since then I have been reassigned.
Q. Ms. Cole, I just wrote down that you said, quote, I wrote a complaint against the manager and ever since then I have been reassigned, end quote. Is that what you just said?
A. That's correct.
Q. Elaborate on that, if you would please.
A. In December 2004, I was interrogated twice by Mr. Alvin Givans in OPS concerning some sexually explicit pictures being sent through the e-mail by supervisors. And as a result of that meeting, I wrote a letter to Mayor Wharton. And that following January, I was reassigned.
Q. In January 2005?
A. That's correct.

25, 2005, Cole filed another charge with the EEOC. It reads:

> I have been and continue to be treated differently in the terms and condition of my employment while working for the [DOC] as a Correctional Officer. Specifically, I have been denied a reasonable accommodation with respect to my disability. I am required to do extensive walking and standing which is contrary to the orders given by the employer's physician and my own personal physician. I am aware of three male Officers who have been granted accommodations for their disabilities. I also believe that I am treated differently because I wrote a letter complaining on a manager. My life has been threatened by inmates of the facility which I was assigned to work.
>
> I believe that I have been and continue to be discriminated against because of my sex (female), disability and in retaliation for filing previous charges of discrimination against the employer in violation of Title VII of the Civil Rights Act of 1964, as amended,; and the Americans with Disabilities Act (ADA).

(Def.'s Exh. 2 at 10.)

Plaintiff was deposed on October 4, 2007. (UMF ¶ 47.) Afterward, DOC management tried unsuccessfully to telephone Cole to discuss arranging a reasonable accommodation for her disability. (*Id.*) DOC Human Resources Manager Vicky Lyons then wrote a letter asking Cole to meet to discuss what she would consider a reasonable accommodation. (*Id.*) Cole received the letter on December 14, 2007, and immediately submitted a notice of retirement. (*Id.* at 48.)

## II. Jurisdiction

The court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 42 U.S.C. § 2000e–5(f)(3).

## III. Standard of Review on Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted if the pleadings and evidence on file show that there is no genuine issue as to any material fact. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986). The moving party can meet this burden by pointing out that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of its case. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts establishing that there is a genuine issue for trial by showing that a reasonable jury could return a verdict for the

---

Q. I have been taking notes, and I may have had a mistake. I'm not trying to trip you up. So, please correct me if I am wrong. I think you testified that you talked to Andrew Taber in 2002, and you requested assignment to a control post because of your physical situation, and that he accommodated you, and you were assigned to a control post for a while. I think I asked you when did that change. I think you said in 2004. And I said, what happened then? You said, I wrote a complaint against the manager and ever since then I have been reassigned. Is there something else you want to add between there?

A. That's incorrect. I said in 2005 that was when.

(Cole Depo. at 18–20.)

nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims." *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). The district court does not have the duty to search the record for that evidence. *See InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 110–11 (6th Cir.1989). The nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in its favor. *See id.*

## IV.  Analysis

### A.  Section 1983 Claim Based on Violations of Rights Under the ADA and Title VII

Plaintiff alleges that Defendant's failure to accommodate her disability infringed her rights under the ADA and Title VII in violation of § 1983. (Am. Compl. ¶ 10.) Defendant argues that violations of the ADA and Title VII cannot support claims under § 1983. Tacitly conceding the point, Plaintiff does not address her § 1983 claims or respond to Defendant's argument in her response in opposition to summary judgment.

■ Title VII and the ADA are independently actionable and have comprehensive remedial schemes. Violating them does not give rise to separate claims under § 1983. *See Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1205 (6th Cir. 1984) (Title VII), *Vinson v. Thomas,* 288 F.3d 1145, 1156 (9th Cir.2002) (ADA), *Lollar v. Baker,* 196 F.3d 603, 610 (5th Cir. 1999) (ADA), *Alsbrook v. City of Maumelle,* 184 F.3d 999 (8th Cir.1999) (en banc) (ADA), *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1531 (11th Cir.1997) (ADA). Therefore, Defendant's motion for summary judgment on Plaintiff's § 1983 claims for violations of the ADA and Title VII is GRANTED.

### B.  ADA Claim

The Americans with Disabilities Act states that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The Act defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). Discrimination under the act extends to the failure to make reasonable accommodations to otherwise qualified individuals with disabilities. *Id.* § 12112(b)(5)(A).

Plaintiff alleges that Defendant "den[ied] her a reasonable accommodation in regard to her disability (Ruptured Tendon and Degenerative Joint Disease), spe-

cifically requiring her to engage in extensive walking and standing contrary to physician's orders." (Am. Compl. ¶ 10.)

■ To establish a *prima facie* case of failure to accommodate under the ADA, a plaintiff must show that: "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Myers v. Cuyahoga County, Ohio,* 182 Fed.Appx. 510, 515 (6th Cir.2006) (citing *DiCarlo v. Potter,* 358 F.3d 408, 419 (6th Cir.2004)).

■ Defendant argues that Plaintiff cannot succeed on her ADA claim "because she cannot demonstrate that she was a *qualified* individual with a disability."[5] (Def.'s Mem. at 8.) To support this argument Defendant refers the court to Plaintiff's sworn deposition.

During the deposition Plaintiff was asked to read from a questionnaire she filled out in the course of filing a 2004 EEOC charge. The questionnaire asked the respondent to "Describe the duties of the job. Indicate which are major (or which are minor)." (Cole Depo. at 109–10.) In response to the question, Plaintiff wrote:

> I am responsible for the care and custody of inmates. Essential aspects of the job are standing and walking to make fifteen-minute security checks,[6] conducting various checks, escorting inmates to and from various activities, appoint-

ments, etc., sometimes necessary to respond to an emergency situation. (*Id.* at 110.)

Plaintiff and defense counsel then engaged in the following exchange:

Q. Which of those essential aspects are you unable to perform?

A. Security checks, escorting of inmates, responding in emergency situation.

Q. What percentage of the job are those?

A. Ninety percent.

Q. What essential elements of your job as a corrections officer are you able to perform today?

A. Documentation.

(*Id.* at 111.)

■ An admission by a plaintiff that he or she cannot perform an essential function of their job without accommodation "negate[s] the qualified individual element" of an ADA claim. *Townley v. Blue Cross & Blue Shield of Mich.,* 254 F.Supp.2d, 661, 666 (E.D.Mich.2003). As explained by the Sixth Circuit:

> If a claimant cannot show that she can perform the essential functions of a given position with or without an accommodation, she is not a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12111(8), and accordingly fails to make out a prima facie case of discrimination. The ADA does not demand that an employer exempt a disabled employee from an essential function of the job as an accommodation. What [Plaintiff] requests is not an accommodation, but rather an exemption

---

5. Defendant makes several alternative arguments. They are not addressed because Plaintiff's admission about her inability to perform her job as a corrections officer negates an essential element of her ADA claim.

6. That is, the guard is required to make rounds (or security checks) every fifteen minutes. (Cole Depo. at 110.)

and, as such, does not survive the threshold determination of whether she is a "qualified individual with a disability."

*Brickers v. Cleveland Bd. of Ed.*, 145 F.3d 846, 850 (6th Cir.1998) (internal citations omitted); *see also Plant v. Morton Intern., Inc.*, 212 F.3d 929, 937 (6th Cir.2000) (Plaintiff "not 'otherwise qualified'... because by his own admission he could not perform the essential functions of the job"), *Conners v. SpectraSite Commc'ns*, 465 F.Supp.2d 834, 856–57 (S.D.Ohio 2006) (Plaintiff's "own admissions from his deposition 'negate the qualified individual element' of his ADA claim"), *Winters v. Crittenden County Bd. of Ed.*, 2006 WL 228918, at *3 (W.D.Ky.2006) ("plaintiff's sworn assertion in an application for disability benefits that she is ...'unable to work' will appear to negate an essential element of her ADA case").

Plaintiff admits that she could not perform several of the essential functions of her former job and that, other than transferring her to another department within the Shelby County government, Defendant could do nothing to accommodate her disability. (Am. Compl. ¶¶ 109–11, 122.) Unable to perform several of the "essential functions of" a Shelby County corrections officer, Plaintiff cannot establish that "with or without accommodation" she was a "qualified individual with a disability" under the ADA. *Brickers*, 145 F.3d at 850.

Plaintiff cannot prevail on her ADA claim because her sworn statements preclude a reasonable jury from finding that she was a "qualified individual" under the ADA and thus negate an essential element of the *prima facie* case. Therefore, Defendant's motion for summary judgment on Plaintiff's failure to accommodate claim under the ADA is GRANTED.

## C. Title VII Gender Discrimination Claim

Plaintiff alleges that Defendant violated Title VII by discriminating against her because of her gender. Specifically, she claims that men were granted permanent reasonable accommodations for their disabilities while she, a woman, was not. Plaintiff offers no direct evidence of discrimination and therefore must rely on indirect evidence.

■ To make a *prima facie* case of Title VII discrimination based on indirect evidence Plaintiff must demonstrate: (1) membership in a protected class, (2) an adverse employment action, (3) qualification for accommodation, and (4) differing treatment for similarly situated person(s) outside the protected class. *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 731 (6th Cir.2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

If Plaintiff establishes a *prima facie* case, an inference of discrimination arises. *Hoskins*, 227 F.3d at 731. This inference may be rebutted by Defendant's pointing to a legitimate, nondiscriminatory reason for differing treatment. *Id.* If Defendant succeeds, the burden falls on Plaintiff to show that the proffered reason is a pretext. *Id.*

To establish her Title VII claim, Plaintiff points to the treatment of DOC correctional officers Willie Hughes, Warren Tillman, Louis Price, and Lawrence Thomas. Plaintiff alleges that each of these four men was given preferential treatment, namely assignments to light duty posts.

### i. Willie Hughes

■ Willie Hughes was assaulted by inmates. (UMF ¶ 90.) As a result of injuries sustained during the assault, Hughes was permanently reassigned to the train-

ing academy, a light duty post. (*Id.* ¶¶ 62, 90) Plaintiff concedes that the assault constituted an on-the-job injury, that her foot problems are not an on-the-job injury, and that she never requested a reassignment to the training academy. (*Id.* ¶¶ 62, 90–92.)

Defendant argues that Hughes and Plaintiff are not similarly situated because Hughes, unlike Plaintiff, suffered an on-the-job injury. (Def.'s Mem. at 13.) The distinction is important because the official treatment of on-the-job injuries differs from the treatment of off-duty accidents or illnesses.

In his 1999 memorandum about light duty assignments for off-duty accidents or illnesses, DOC Director Mark Luttrell stated that, "[i]t is important to note that these policies do not apply to On–the–Job-Injury (OJI) cases . . . . [which] will continue to be handled according to existing county policy." (Def.'s Exh. 2 at 3.) That policy, set out in the Administrative Policies and Procedures of the Shelby County DOC, states that those suffering an on-the-job injury may be assigned to a "modified duty" post requiring only some "light bending and walking." (*Id.* at 27.) Although the 1999 and 2004 memos about off-duty accidents or illnesses specifically state that DOC policy does not permit permanent light duty assignments in such cases, the Administrative Policies and Procedure on OJI cases are silent on the issue. (*Id.* at 2–5, 22–27.)

Because Hughes suffered an on-the-job injury and Plaintiff did not, they were subject to different DOC policies. Therefore, Hughes and Plaintiff are not "similarly situated" persons for purposes of Title VII analysis. *Hoskins*, 227 F.3d at 731.

### ii. Warren Tillman

■ Warren Tillman had leg problems and was assigned to a post in K Building—the only accommodation he ever received.

(UMF ¶ 39.) His leg problems did not arise from an on-the-job injury. (*Id.* ¶ 64.) Tillman remained assigned to K building until he resigned from the DOC in 2001. (*Id.* ¶¶ 83–85.) Plaintiff contends that the DOC's treatment of Tillman amounted to a permanent light duty assignment for an off-duty accident or illness. (*Id.* ¶ 64.)

The DOC deems K building a light duty post. (*Id.* ¶ 38.) Plaintiff nonetheless contends that her own assignment to K Building was not a reasonable accommodation for her difficulty in walking or standing for extended periods. (*Id.* ¶¶ 35–36, 38–39.)

Without addressing the merits of Plaintiff's argument about Tillman's treatment, Defendant argues that Plaintiff's claims arising from the DOC's treatment of Tillman are time-barred. (Def.'s Mem. at 13.) In response, Plaintiff argues that the limitations period should be tolled because Defendant engaged in a continuing violation of Plaintiff's rights.

Title VII makes it an "unlawful employment practice" to discriminate against any individual in the terms or conditions of his or her employment on the basis of gender. 42 U.S.C. § 2000e–2(a)(1). To challenge an unlawful practice in court, a plaintiff must first file a charge of discrimination with the EEOC within 300 days "after the alleged violation occurred." *Id.* § 2000e–5(e)(1). The failure to do so precludes claims from being brought in court. *Id.* § 2000e–5(f)(1).

Tillman resigned from the DOC on April 22, 2001. (UMF ¶ 85.) Plaintiff filed her EEOC complaint on April 28, 2004. (*Id.* ¶ 24.) The filing of the EEOC complaint plainly falls outside the limitations period for claims arising from the treatment of Tillman *unless* they can be linked to more recent purported acts of discrimination (namely those arising from the treatment of Louis Price and Lawrence Thomas).

Although a series of discrete acts at times appears to form a pattern or practice that warrants unified treatment, the Supreme Court has held that this is generally not permitted under the statutory text of Title VII. *See, e.g., Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 550 U.S. 618, 127 S.Ct. 2162, 2166–72, 167 L.Ed.2d 982 (2007), *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *but see id.* at 115–21, 122 S.Ct. 2061 (noting an exception for claims of hostile work environment, claims whose "very nature involves repeated conduct.").

In *Morgan,* the plaintiff alleged violations of Title VII arising from discrimination, hostile work environment, and retaliation on the basis of his race. *Id.* at 108, 122 S.Ct. 2061. Several of the acts giving rise to those claims fell outside the limitations period, but the Ninth Circuit allowed them to be considered under a "continuing violation doctrine." *Id.* As applied to claims of discrimination and retaliation, the Supreme Court in *Morgan* found application of the doctrine inappropriate. *Id.* at 115, 122 S.Ct. 2061. Summarizing the holdings of prior cases, it explained:

> *[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act.* The charge, therefore, must be filed within the 180– or 300–day[7] time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently

discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim. *Id.* at 113, 122 S.Ct. 2061 (emphasis added).

Explaining the rationale for its prior holdings, the Supreme Court wrote that "[d]iscrete acts such as termination, failure to promote, denial of transfer or refusal to hire are easy to identify. Each incident of discrimination ... constitutes a separate actionable 'unlawful employment practice.' " *Id.* at 114, 122 S.Ct. 2061.

Here, Plaintiff alleges that Tillman was given a permanent assignment to a light duty position and that she was not. This is similar to a "denial of transfer" and therefore falls under the rule of *Morgan.* Although Plaintiff alleges similarly preferential treatment was offered to Price and Thomas, Tillman's treatment constituted a discrete unlawful employment practice and the April 28, 2004, EEOC charge was thus untimely.[8] Therefore, Tillman's treatment—although admissible as "background evidence in support of a timely claim"—cannot itself form the basis of a Title VII claim. *Id.* at 113–14, 122 S.Ct. 2061.

### iii. Louis Price and Lawrence Thomas

■ Both Louis Price and Lawrence Thomas suffered off-duty illnesses. Price had severe gout and was assigned to a filing post in the staffing department in 2005. (UMF ¶ 88, Cole Depo. at 15.) Plaintiff concedes that she never requested assignment to the staffing department. (UMF ¶ 89.) After undergoing neck sur-

---

7. In some states that time period is shortened to 180 days. Here, the parties agree that the 300 day window is applicable.

8. Although not dispositive, Plaintiff's EEOC charge lists the earliest date of discrimination as March 25, 2004. (Def.'s Exh. 2 at 7.) This omits claims related to Tillman.

gery, Thomas was temporarily assigned to light duty posts in the control center and the sally port. (*Id.* ¶ 87.) Although the DOC considers the sally port a light duty post, Plaintiff claims that her own assignment to it was not a reasonable accommodation for her disability. (*Id.* ¶¶ 67, 74–75.)

In its statement of undisputed material facts, Defendant claims that "[n]either Lawrence Thomas nor Louis Price were assigned to *permanent* light duty positions" and that Plaintiff knows of "no one presently employed by the [DOC] who [is] assigned to a *permanent* light duty position." (*Id.* ¶¶ 61, 66) (emphasis added).

Defendant submitted ninety-four separate undisputed material facts, of which Plaintiff objected to thirteen. (*See id.*, Pl.'s Resp. to UMF ¶¶ 1–13.) In her response, Plaintiff did not object to Defendant's claims that neither Thomas nor Price received permanent light duty assignments and that Plaintiff knew of no one currently receiving such treatment. (*See id.*)

Defendant also directs the court to two official DOC memoranda—the first by DOC Director Mark Luttrell in 1999, and the second by DOC Director George Little in 2004. (Def.'s Mem. at 14–15.) Each memo makes clear that DOC policy does not permit permanent light duty assignments for off-duty accidents or illnesses. (Def.'s Exh. 2 at 2–5.)

From these facts two things are clear. First, (considering that Hughes is not similarly situated and that claims relating to Tillman's treatment are time-barred) Plaintiff has no factual support for her claim that she was discriminatorily denied a reasonable *permanent* accommodation. Second, based on the 1999 and 2004 DOC memoranda, DOC policy did not allow permanent light duty assignments to accommodate those suffering off-duty illnesses or accidents.

If Plaintiff's Title VII claim specifically relates to the denial of a reasonable *permanent* accommodation, it cannot be maintained and summary judgment must be awarded for the Defendant. Plaintiff cannot identify *anyone* who received the treatment that she was allegedly denied on the basis of her sex.

If her claim relates only to a denial of a reasonable (albeit non-permanent) accommodation, it may survive because Plaintiff has identified two similarly situated males (i.e. victims of off-duty illnesses) whom she alleges were treated more favorably because of their sex. That neither male was given a *permanent* accommodation would not negate an essential element of Plaintiff's theory of the case.

The question is whether Plaintiff's Title VII claims relate specifically to the denial of a *permanent* accommodation. The answer is found in her complaint. In this case, there are two complaints—the original *pro se* complaint and a later amended complaint that reincorporated its predecessor.

The original *pro se* complaint frames the issue as follows: "I have been denied a reasonable *permanent* accommodation by my employer." (Compl. ¶ 10) (emphasis added). This language tracks the allegations in Plaintiff's April 28, 2004, EEOC charge. (Def.'s Exh. 2 at 7) ("I have been denied a reasonable accommodation on a permanent basis.").

The amended complaint expressly "realleges the allegations stated in the original Complaint." (Am. Compl. ¶ 2.) It nonetheless restates Plaintiff's Title VII claim as: Defendant violated Plaintiff's statutory rights by "denying her a reasonable accommodation in regard to her disability." (*Id.* ¶ 10.) This follows the language in Plaintiff's later, January 25, 2005, EEOC Charge. (Def.'s Exh. 2 at 10) ("I

have been denied a reasonable accommodation with respect to my disability.")

Although denial of a "reasonable accommodation" can plausibly be read to encompass the denial of a "reasonable permanent accommodation," the inverse does not follow. That is, it is impossible to conclude that in describing a denial of a permanent accommodation in the first instance, Plaintiff *actually* intended to refer to a more general denial of a non-permanent accommodation. This tends to the conclusion that the original "permanent" meaning was intended.[9]

An amended complaint can supersede an original complaint, but that is not the case here. Rather, the amended complaint expressly incorporates the original complaint. (Am. Compl. ¶ 2) (Plaintiff "realleges the allegations stated in the original Complaint.") That the amended complaint did not alter Plaintiff's Title VII claims is further evidenced by language in her response to Defendant's motion for summary judgment:

> Plaintiff filed an Amended Complaint on February 15, 2007 and alleged *further* that Defendant had violated her rights under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution as well as naming additional Defendants.

(Pl.'s Resp. at 1) (emphasis added). This response makes clear that the amended complaint supplemented the original by adding new claims and defendants, but did not alter the preexisting claims and, in particular, Plaintiff's claim under Title VII.

This conclusion is bolstered by the arguments in Plaintiff's response. Plaintiff argues at length that Hughes is similarly situated and that claims tied to Tillman's treatment are timely. (Pl.'s Resp. at 5–6.) No mention is made of claims tied to Price or Thomas, although Defendant argues they too are meritless. (*See id.*, Def.'s Mem. at 14–16.) The tacit implication is that the success of Plaintiff's Title VII claims hinges on Hughes and Tillman, *not* Price and Thomas.

Plaintiff's phrasing of her claim varies at times, but the thrust of it is that she was denied a permanent reasonable accommodation. She refers the court to Hughes, Tillman, Price, and Thomas. The parties concede that, of these four, only Hughes and Tillman received permanent accommodation. (UMF ¶¶ 62, 64.) Hughes' treatment is inapposite because he suffered an on-the-job injury and is thus not similarly situated. Likewise, Plaintiff cannot base her claim on Tillman's treatment because she did not object to it during the applicable limitations period. This leaves only Price and Thomas, neither of whom received the treatment that Plaintiff claims to have been denied on the basis of her gender. Therefore, Defendant's motion for summary judgment on Plaintiff's Title VII discrimination claim is GRANTED.

## D. Fourteenth Amendment Equal Protection Claim

Plaintiff also characterizes her gender discrimination claim as an infringement of her right to equal protection under the Fourteenth Amendment and thus a

---

9. That Plaintiff alleges denial of a reasonable permanent accommodation is further suggested by her deposition. In it, Plaintiff states that there is nothing the DOC can do to assist her in performing several of the essential functions of her job (e.g. making security checks, escorting inmates, and responding to emergencies). (Cole Depo. at 121–22) Instead, she claims that the only solution is to assign her to posts that do not require her to perform those essential functions (e.g. control center posts) or, alternatively, to give her a lateral transfer out of the DOC and into another government job in Shelby County. (*Id.* at 109–12, 121–22.)

violation of 42 U.S.C. § 1983. "The showing a plaintiff must make to recover on an employment discrimination claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983." *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 794 (6th Cir.2000) (citing *Risinger v. Ohio Bureau of Workers' Compensation,* 883 F.2d 475, 483–84 (6th Cir.1989)); *see also Wilson v. Ohio,* 178 Fed.Appx. 457, 467 (6th Cir.2006).

As explained in the preceding section, Plaintiff cannot rely on the treatment of Price and Thomas to sustain her claim because neither received a permanent light duty assignment, a position Plaintiff claims to have been denied because of her sex. Similarly, although Hughes was granted a permanent light duty assignment, his treatment is irrelevant because, as the victim of an on-the-job injury, he was subject to different DOC policies and thus was not similarly situated to Plaintiff. This leaves only Tillman.

▪ The statute of limitations applicable to a § 1983 claim is the statute for personal injury actions in the state in question. *See Owens v. Okure,* 488 U.S. 235, 251–52, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989), *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–62, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). The limitations period for personal injury actions in Tennessee is one year. Tenn.Code. Ann. § 28–3–104(a)(3). Therefore, Plaintiff's § 1983 claim is governed by a one-year statute of limitations. *Merriweather v. City of Memphis,* 107 F.3d 396, 398 (6th Cir.1997). Plaintiff filed her initial complaint *pro se* on November 15, 2005. Tillman resigned from the DOC over four years earlier, on April 22, 2001. Plaintiff's § 1983 claim-insofar as it relates to Tillman—is thus presumptively time-barred.

Although Plaintiff does not raise it, the application of the continuing violations doctrine would toll the limitations period for a claim based on Tillman's treatment. In this case, however, its application would be inappropriate.

"[T]he analysis for a continuing violation under Title VII and § 1983 are the same." *Terry v. Memphis Housing Auth.,* 422 F.Supp.2d 917, 925–26 (W.D.Tenn.2006) (citing *Sharpe v. Cureton,* 319 F.3d 259, 267 (6th Cir.2003)). Because the court has already found that the alleged actions of the DOC do not amount to a continuing violation under Title VII, it follows that they cannot constitute a continuing violation under § 1983. Insofar as it relates to Tillman, Plaintiff's § 1983 claim is time-barred.

▪ Plaintiff cannot succeed on her § 1983 claim because Hughes is not similarly situated, Price and Thomas did not receive the treatment she claims to have been denied because of her gender, and any claim based on Tillman's treatment is time-barred. Therefore, Defendant's motion for summary judgment on Plaintiff's Fourteenth Amendment equal protection claim is GRANTED.

### E. Retaliation Under First Amendment

Plaintiff alleges that Defendant retaliated against her for writing a memorandum to Shelby County Mayor A C Wharton, thus abridging her First Amendment right to free speech and to petition the government in violation of § 1983. To state a First Amendment retaliation claim, a public employee must produce evidence sufficient to establish three elements:

First, the employee must establish that his speech is protected. To accomplish this, the employee must show that his speech touches on a matter of public concern, and demonstrate that his interest in the speech outweighs the government's countervailing interest in promot-

ing the efficiency of the public service it provides as an employer. This determination is a question of law for the court to decide. Second, the employee must show that the employer's adverse action would chill an ordinary person in the exercise of his First Amendment rights. Finally, the employee must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss.

*See v. City of Elyria,* 502 F.3d 484, 492 (6th Cir.2007) (quoting *Taylor v. Keith,* 338 F.3d 639, 643 (6th Cir.2003)) (internal citations omitted).[10]

Defendant argues that Plaintiff's retaliation claim is without merit because her memo did not address a matter of public concern.[11] Plaintiff counters that "the memo involved more than Plaintiff's grievance but an attempt to address an ongoing problem with the Division of Corrections and ongoing litigation against Shelby County and the Department of Corrections." (Pl.'s Mem. at 7.)

The memo is dated December 5, 2004, and is entitled "Harassment From Mr. Alvin Givans." (Ex. to Def.'s Mot. for Summ. J. at 8.) It reads, in pertinent part:

Recently, I have been interrogated on two separate occasions by Mr. Alvin Givans, Internal Affairs, regarding inappropriate pictures sent via email at the Shelby County Correction Center. These pictures have been circulating the compound for approximately one year and possibly seen and/or distributed by several people, yet Mr. Givans has procrastinated in investigating this matter. During both interviews, Mr. Givans neglected to show me the pictures that he was questioning me about, but instead showed me a memo that was addressed to you. It is apparent that Mr. Givans is more interested in investigating who sent a memo rather than who emailed the inappropriate pictures. I have repeatedly advised Mr. Givans that I didn't write the memo, haven't seen or dispersed any pictures, nor can I gain access to the computer, because I don't have a password.

I have been advised by a co-worker who is being questioned regarding this matter that Mr. Givans is trying to persuade her to change her original testimony to say that Officer Jeffery Woodard and I were instrumental in having this information disseminated. During the interrogation on Friday, 12–03–04, Mr. Givans stated to me in the presence of witness, Ms. Carolyn Kizer, that he did not feel that I was being truthful. I am appalled that Mr. Givans has the audacity to question my credibility. I have been employed with the county government approximately 20 years and never has my credibility been questioned. Mr. Givans, on the other hand, work ethics have come into question to the extent that he was reassigned pending investigation of allegations for wrongdoing while assigned to the Internal Affairs Division. I advised Mr. Givans during this meeting, that I felt I was being

---

**10.** Plaintiff attempts to characterize her memo as protected under the Petition Clause of the First Amendment. (Am. Compl. ¶ 13.) Whether viewed as speech or a petition for redress under the First Amendment, the same framework applies. *See Campbell v. PMI Food Equipment Group, Inc.,* 509 F.3d 776, 789 (6th Cir.2007). That is, the court asks, *inter alia,* whether the statement addresses a matter of "public concern." *Id.*

**11.** Defendant also argues that the alleged adverse employment action was not "chilling" and that, even if it were, Defendant could not be held responsible because Plaintiff cannot meet the criteria for municipal liability. Given the court's finding that Plaintiff's memo does not address a matter of public concern, *infra,* Defendant's alternative arguments are moot.

harassed due to being interrogated a second time after an individual changed her previous statement as witnessed by a Union Steward.

Since I had absolutely no involvement in producing, sending, or writing the memo regarding the pictures, the harassment could only be due to me being a plaintiff in a Federal lawsuit against the Division of Corrections.

(*Id.*)

■ "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). The rule promotes "the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Id.* at 419, 126 S.Ct. 1951. If, however, the speech is not directed to a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* at 418, 126 S.Ct. 1951.

■ In the Sixth Circuit, "[a] matter of public concern usually involves a matter of political, social, or other concern to the community." *Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir.1999). "To determine whether the speech involves a matter of public concern, [the court] look[s] to the content, form, and context of the statements." *Jackson v. Leighton*, 168 F.3d 903, 910 (6th Cir.1999). The inquiry "is by necessity a question for case-by-case adjudication." *Akers v. McGinnis*, 352 F.3d 1030, 1037 (6th Cir.2003).

■ "In general, speech involves matters of public concern when it involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Albert v. Mitchell*, 42 Fed.Appx. 691, 693 (6th Cir.2002) (quoting in part *Brandenburg v.*

*Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir.2001)). Put another way, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951 (quoting in part *Connick v. Myers*, 461 U.S. 138, 154, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

■ Contrary to Plaintiff's position, the memo does not "address an ongoing problem with the Division of Corrections and ongoing litigation against Shelby County and the Department of Corrections." (Pl.'s Mem. at 7.) The thrust of the memo is that Plaintiff is being unduly harassed by someone in the internal affairs department. This is a particularized, employment-related grievance and does not qualify as speech on a matter of public concern.

■ The only statement in the memo that approaches Plaintiff's description is that her alleged harassment "could only be due to me being a plaintiff in a Federal lawsuit against the Division of Corrections." (Ex. to Def.'s Mot. for Summ. J. at 8.) Although troubling, this excerpt does not alone qualify the memo as protected speech. Read in the "context of the statement[ ]," the point is ancillary and Plaintiff does not directly accuse her employer of unconstitutional conduct. *Jackson*, 168 F.3d at 910. The statement, taken as a whole, refers to a single incident involving Plaintiff alone and not "an ongoing problem with[in] the Department of Corrections." (Pl.'s Mem. at 7.) As such, "[t]here is no nexus between" the alleged wrongdoing "and any detriment to the public welfare." *Albert*, 42 Fed.Appx. at 693.

The subject of the memo, although "of paramount importance" to Plaintiff, *Id.*, is of no "concern to the community" at large. *Jackson*, 194 F.3d at 746. It does not satisfy the threshold requirement—speech

on a matter of public concern—of a First Amendment retaliation claim. Therefore, Defendant's motion for summary judgment on Plaintiff's § 1983 claim for First Amendment retaliation is GRANTED.

## F. Retaliation Under ADA and Title VII

■■■■ "Retaliation claims are treated the same whether brought under the ADA or Title VII." *Barrett v. Lucent Techs., Inc.,* 36 Fed.Appx. 835, 840 (6th Cir.2002) (citing *Penny v. UPS,* 128 F.3d 408, 415 (6th Cir.1997)). To establish a *prima facie* case for retaliation a plaintiff must demonstrate that: (1) she engaged in protected activity (under the ADA or Title VII), (2) the activity was known to the employer, (3) she thereafter suffered an adverse employment action, and (4) a causal link exists between the protected activity and the adverse employment action. *Clark v. City of Dublin, Ohio,* 178 Fed.Appx. 522, 525 (6th Cir.2006); *see also Kuriatnyk v. Township of Bazetta, Ohio,* 93 Fed.Appx. 683, 686 (6th Cir.2004), *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000).

At her deposition Plaintiff identified three[12] incidents she believed were adverse employment actions taken in retaliation for her engagement in protected activity under the ADA and Title VII. Defendant argues that Plaintiff cannot sustain her retaliation claims because none of the alleged incidents constitutes an adverse employment action and because no purported adverse action is causally linked to Plaintiff's protected activity.

### i. Informal reprimand by Robert Moore

■■■ The first alleged incident took place "[y]ears ago" when, during a meeting, then DOC Chief of Security Robert Moore told Plaintiff that, "I know you help a lot of [correctional] officers with their paperwork, and as a sergeant, that is something you shouldn't be doing." (Cole Depo. at 95, UMF ¶ 42.) Plaintiff believes this statement was made in retaliation for filing an EEOC claim. *(Id.)*

Viewing the facts in the light most favorable to Plaintiff, Moore's statement was a verbal reprimand. If it had led to some form of actual punishment, it might be found to contribute to an adverse employment action. Standing alone, however, it does not constitute one.

In the Sixth Circuit, it is well-established that informal discipline, reprimands, and "write-ups" cannot support claims of retaliation. *See, e.g., Handshoe v. Mercy Medical Center,* 34 Fed.Appx. 441, 447 (6th Cir.2002) (disciplinary meeting and write-up not adverse employment action), *Allen v. Michigan Dep't of Corrections,* 165 F.3d 405 (6th Cir.1999) ("counseling memoranda" disciplining employee for specific rules infractions not adverse employment action), *Reid v. Madison County, Tenn.,* 1999 WL 196560, at *2 (6th Cir. 1999) (verbal reprimand not adverse employment action).

Therefore, Defendant's motion for summary judgment on Plaintiff's claims of ADA and Title VII retaliation based on the statement of Robert Moore is GRANTED.

Plaintiff did not object to these statements of fact in her response to Defendant's undisputed material facts. *(See generally* Pl.'s Resp. to UMF.) Although not alleged as ADA or Title VII retaliation, certain other events are nonetheless addressed, *infra,* in the "[o]ther miscellaneous events" section.

**12.** Plaintiff's response disputes this number, but fails to specify any acts of retaliation Defendants omit. (Pl.'s Resp. at 8.) Defendant's statement of undisputed material facts also clearly states that Plaintiff alleges *three* incidents of retaliation and proceeds to describe each in detail. (UMF ¶¶ 41–45A.)

### ii. Reassignment

The second alleged incident is Plaintiff's reassignment from a light duty control center post to a non-light duty post in the A and B Wing of Bravo Building. (Cole. Depo. at 18–19, UMF ¶¶ 27–28, 43.)

An adverse employment action is one that would dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Whether reassignment constitutes an adverse employment action "depends on the circumstances of a particular case." *Id.* at 2417 (2006); *see also Brennan v. Tractor Supply Co.*, 237 Fed.Appx. 9, 24 (6th Cir.2007) (same).

Plaintiff is flat-footed, has ruptured tendons in both feet, and suffers from degenerative joint disease. (UMF ¶ 5.) It is painful for Plaintiff to stand or walk for extended periods of time. Given her condition and the pain associated with it, a reasonable juror could find that Plaintiff's reassignment from a light duty control center post to a normal post (here, A and B Wing of Bravo Building) that requires extensive standing and walking constituted an adverse employment action. The inquiry thus turns to causation.

Plaintiff's filings in this court and her response to Defendant's motion characterize the reassignment as retaliation for activity protected under the ADA and Title VII. These claims are contradicted by Plaintiff's testimony during her deposition, her statements in a letter she wrote about her situation, and in her most recent complaint to the EEOC.

During Plaintiff's deposition she was asked to elaborate on her January 2005 reassignment from a light duty control center post to Bravo Building. She responded as follows:

In December 2004, I was interrogated twice by Mr. Alvin Givans in OPS concerning some sexually explicit pictures being sent through the e-mail by supervisors. And as a result of that meeting I wrote a letter to Mayor Wharton. And that following January, I was reassigned.

(Cole Depo. at 19.)

The purported link between Plaintiff's memorandum to Mayor Wharton and her January reassignment was further established by the following exchange:

Q. Can you tell me about any other times when you feel like you have been retaliated against for any reason?

A. When I was reassigned to Bravo Building A and B wing *after I wrote a complaint on Mr. Alvin Givans.*

(Cole Depo. at 80) (emphasis added).

These statements suggest that Plaintiff attributes her reassignment to her memorandum to Mayor Wharton. As noted during the court's analysis of Plaintiff's First Amendment retaliation claim, the object of the memo is to complain about undue harassment by Givans; it does not allege a violation of rights under the ADA or Title VII. As such, it does not constitute protected activity under the ADA or Title VII, and action taken in response does not constitute retaliation in violation of those statutes. *Comiskey v. Automotive Industry Action Group*, 40 F.Supp.2d 877, 898–99 (E.D.Mich.1999).

Plaintiff might succeed in showing causation were she to tie her reassignment to the filing of an EEOC claim. Plaintiff makes no such attempt, and the record does not support a causal link. Plaintiff made two EEOC complaints around the time of her reassignment.

The first EEOC complaint was filed on April 28, 2004, and complains of the DOC's

failure to award Plaintiff a "reasonable accommodation on a *permanent basis.*" (Def.'s Exh. 2 at 7.) Any connection between this complaint and the January reassignment is unlikely because of the substantial lapse of time between events (almost nine months) and the presence of a much more likely intervening cause (the Wharton memo). Considering these facts, a reasonable jury could not find a causal connection.

The second EEOC complaint was filed on January 25, 2005. (Def.'s Exh. 2 at 10.) Although the record does not state when Plaintiff was reassigned, several factors suggest that it was before the complaint was filed. The EEOC complaint itself states that Plaintiff is "required to do extensive walking and standing," a problem that did not arise until after her reassignment from the control center post. Also, in a February 14, 2005, letter sent to Mayor Wharton, Governor Phil Bredesen, and a host of others, Plaintiff's description of the events suggests that the complaint came after the transfer. (Def.'s Exh. 2 at 12) ("Once again in January 2005, I was reassigned to a post ... requiring extensive standing and walking. On January 25, 2005, I filed another gender discrimination and retaliation charge at Federal EEOC in regard to my disability and requested a Notice of Right to Sue."). Plaintiff has not alleged that the 2005 EEOC complaint was the cause of her reassignment. Even if she had, there can be no causal connection where the purported adverse employment action occurred *before* the exercise of protected activity. *See Gentry v. Summit Behavioral Healthcare,* 197 Fed.Appx. 434, 441 (6th Cir. 2006), *Riley v. Columbus Bd. of Educ.,* 2008 WL 696808, at *11–*13 (S.D.Ohio 2008).

Although her reassignment could be found to be an adverse employment action, Plaintiff cannot establish that it was caused by her exercise of protected activity under the ADA or Title VII. On the contrary, the record suggests that, if anything, the reassignment was causally linked to Plaintiff's memo to Mayor Wharton—which was *not* protected activity under those statutes. The most obvious examples of protected activity in the record are Plaintiff's 2004 and 2005 complaints to the EEOC. However, Plaintiff does not allege that they prompted the transfer, and independent examination reveals that neither complaint supports a causal connection.

Plaintiff cannot establish a causal connection between her exercise of protected activity under the ADA or Title VII and her January 2005 reassignment. Therefore, Defendant's motion for summary judgment on Plaintiff's claims for retaliation based on her reassignment is GRANTED.

### iii. Temporary pay docking

The third alleged incident took place when John Latimer, of DOC Human Resources, docked Plaintiff eight hours of pay for her failure to give advance notice that she would be missing work for a doctor's appointment. (Cole. Depo. at 76–77, 80–81, UMF ¶ 44.) After Plaintiff complained, however, her pay was restored. (Cole. Depo. at 77, UMF ¶ 44.)

At her deposition, Plaintiff did not recall when this episode took place, nor did she specify what conduct, if any, she engaged in that was protected under the ADA or Title VII. (Cole Depo. at 76–77, 80–81.) Plaintiff's response is also silent on this issue, offering nothing but the conclusory statement that "Plaintiff has shown a causal connection between her engaging in protected activity and the adverse employment actions taken against her." (Pl.'s Resp. at 8.)

To make a *prima facie* claim of retaliation, a "plaintiff must offer specific evidence 'sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Hollowell v. Michigan Consol. Gas Co.*, 50 F.Supp.2d 695, 703 (E.D.Mich.1999) (quoting in part *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990)). No such showing is made here.

█ Plaintiff avers that, at some unknown time, she was temporarily docked pay for failing to give advance warning that she would miss work for a doctor's appointment. She adds that she has, in the past, filed complaints alleging discrimination under the ADA and Title VII to the EEOC. Other than conclusory statements in Plaintiff's response, no attempt is made to link the two events to each other—logically, temporally,[13] or otherwise—so as to allow the court to infer any kind of causal relation. Conclusory statements do not satisfy the causation requirement of a retaliation claim. *Barrett v. Whirlpool Corp.*, 543 F.Supp.2d 812, 831–33 (M.D.Tenn.2008).

█ Although a seemingly obvious form of retaliation, the denial, reduction, or temporary withholding of pay cannot support a claim of retaliation without some showing of causation. *Hollowell*, 50 F.Supp.2d at 703–04 (reduction in pay); *see also Jenkins v. Bd. of Educ. of City of New York*, 64 Fed.Appx. 801, 805 (2d Cir.2003) (temporary withholding of paychecks), *Despanie v. Henderson*, 32 Fed.Appx. 390, 392 (9th Cir.2002) (denial of request for sick leave pay).

Plaintiff makes no attempt to show causation. Without it, her claims of retaliation based on the temporary docking of pay are insupportable. Therefore, Defen-

dant's motion for summary judgment on Plaintiff's claims of ADA and Title VII retaliation based on the temporary docking of pay is GRANTED.

### iv. Other miscellaneous events

During Plaintiff's deposition the events described above were specifically alleged as examples of retaliation. (UMF ¶¶ 41–44.) In addition, two events were described that, although not specifically alleged as instances of retaliation, merit brief discussion here.

First, Plaintiff claims to have been harassed by Lieutenant Edgar Hampton, who called her to discuss her Family and Medical Leave Act paperwork after she had taken some time off work. (UMF ¶ 44A.) Plaintiff conceded that it was Lt. Hampton's job to contact her about her FMLA paperwork and that she did *not* believe the call was retaliatory in nature. (Cole Depo. at 58–59.) The admission that, although perhaps bothersome, Lt. Hampton's phone call was not retaliatory precludes a retaliation claim by Plaintiff based on this action.

█ Second, Plaintiff claims that she was "at least twice" notified of possible major discipline, and once told by a fellow employee that she was rumored to be "targeted for termination." (Cole Depo. at 82–83, UMF ¶ 45A.) Plaintiff does not, however, link these claims to any actions protected under the ADA or Title VII. Absent some showing of a causal connection, these incidents cannot support a claim of retaliation. *See Offutt v. Warren County Regional Jail*, 109 Fed.Appx. 740, 743 (6th Cir.2004), *Driggers v. City of Owensboro, Kentucky*, 110 Fed.Appx. 499, 511 (6th Cir.2004).

**13.** "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir.2006).

## V. Conclusion

For the foregoing reasons, Defendant Shelby County's motion for summary judgment is GRANTED.